(No. 71162.—

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT TURNER, Appellant.

*Opinion filed February 18, 1993.—Rehearing
denied March 29, 1993.*

J. Steven Beckett and Carol A. Dison, of Beckett & Associates, P.C., of Urbana, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen, Assistant Attorney General, of Chicago, of counsel, and Nedra Jenkins, law student), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Macoupin County, defendant, Robert Turner, was found guilty of murder, aggravated criminal sexual assault, criminal sexual assault, aggravated kidnapping, kidnapping, unlawful restraint, and robbery (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a), 12—14(a)(1), (a)(2), 12—13(a)(1), 10—2(a)(3), 10—1(a)(1), 10—3(a), 18—1). At defendant's sentencing hear-

ing, the jury found defendant eligible for the death penalty on the ground that there existed one or more of the aggravating factors set forth in section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)). The jury found no mitigating factors sufficient to preclude a sentence of death. Accordingly, the trial court sentenced defendant to death.

On direct appeal, this court affirmed defendant's convictions for murder, aggravated criminal sexual assault, criminal sexual assault, aggravated kidnapping, and robbery, vacated his convictions and sentences for kidnapping and unlawful restraint, vacated his death sentence and remanded the cause to the trial court for a new hearing on the second phase of defendant's death sentence hearing. (*People v. Turner* (1989), 128 Ill. 2d 540, 573.) On remand, defendant elected to be resentenced by the trial judge. At the second capital sentencing hearing, the trial judge found that there were no mitigating factors sufficient to preclude a sentence of death. Accordingly, the trial court sentenced defendant to death. Defendant's sentence has been stayed (134 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603). We now affirm defendant's sentence.

## FACTS

The facts which underlie defendant's convictions are discussed in detail in defendant's first direct appeal (see *Turner*, 128 Ill. 2d 540) and will be repeated here only insofar as they are relevant to the issues raised in this present appeal. Additionally, in the interest of brevity, evidence at resentencing is presented in the analysis portion of this opinion.

## ANALYSIS

The sole issue presented for our review is the propri-

ety of defendant's death sentence. At the outset, we note that the "[i]mposition of the death penalty requires an individualized assessment of the circumstances and character of the offender and the offense." (*People v. Tye* (1990), 141 Ill. 2d 1, 29, citing *Eddings v. Oklahoma* (1982), 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 8-9, 102 S. Ct. 869, 874-75.) In reviewing the appropriateness of that sentence in a particular case, we will consider "whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty." (*People v. Johnson* (1989), 128 Ill. 2d 253, 280.) Where it is determined that a sentence is inappropriate or excessive, in light of the facts and circumstances of the particular case, this court has authority to vacate that sentence. See 134 Ill. 2d R. 615(b)(4); see, *e.g., People v. Leger* (1992), 149 Ill. 2d 355; *People v. Gleckler* (1980), 82 Ill. 2d 145; *People v. Crews* (1969), 42 Ill. 2d 60.

The power conferred upon reviewing courts to alter sentences imposed by trial courts, however, should be applied with considerable caution and circumspection. (*People v. Taylor* (1965), 33 Ill. 2d 417, 424.) In our review, we are mindful that the trial court ordinarily has a superior opportunity in the course of trial and hearing in aggravation and mitigation to make a more sound determination concerning the punishment to be imposed than does the reviewing court. *People v. Gold* (1967), 38 Ill. 2d 510, 518.

Defendant's challenge to the propriety of his death sentence centers on the trial court's consideration of aggravation and mitigation evidence. Under our sentencing scheme, the second phase of a death penalty hearing requires the jury or the court to weigh and balance any mitigating factors against the aggravating factors. (*People v. Brownell* (1980), 79 Ill. 2d 508, 534;

see *People v. Thomas* (1990), 137 Ill. 2d 500, 538.) If there are no mitigating factors sufficient to preclude imposition of the death penalty, the court shall sentence the defendant to death. See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(h).

Defendant first contends that the trial court failed to properly balance the factors in aggravation and mitigation. Thus, defendant maintains, his death sentence should be vacated. He urges several points in support of his contention.

Defendant first argues that the trial court's characterization of his prison inmate conduct as self-serving is inconsistent with the facts of the case. He cites to a portion of the court's sentencing comments in which the trial judge stated that "[t]he Court considers that the prison conduct of the defendant was in preparation for his sentencing hearing and not a genuine change of heart." Defendant points out that he was convicted and sentenced for the charged offenses in 1986. From 1986 to 1989, he was unaware that his death sentence would be vacated. Thus, he argues, it could hardly be said that his good conduct was in preparation for his sentencing hearing.

Defendant further asserts that the period of incarceration following his direct appeal and vacatur of his first death sentence can only be characterized as "continued favorable conduct" and not as an ingenuous attempt to show a change of heart.

As defendant correctly notes, favorable evidence of a defendant's conduct while incarcerated is *potentially* mitigating and is, therefore, relevant and admissible at a capital sentencing hearing. (*People v. Jones* (1988), 123 Ill. 2d 387, 419; see *Skipper v. South Carolina* (1986), 476 U.S. 1, 90 L. Ed. 2d 1, 106 S. Ct. 1669.) However, the fact that evidence is potentially mitigating does not

automatically render it sufficient to preclude a sentence of death.

Here, the trial court expressly stated that it considered "defendant's inmate record as one of the population of the Illinois Department of Corrections since 1986 which shows only one infraction." The court cited several other "specific examples [of mitigating evidence] to indicate that the court considered all of the evidence presented in mitigation." The court concluded, however, that it found no credible, probative evidence which indicates that the defendant has the potential to be restored to useful citizenship.

We note that the court did not reference a time period as it related to the "change of heart" remark. Nonetheless, defendant asks us to accept that the remark referenced the entire post-conviction period. We decline to do so. It is clear from the court's opening remarks at resentencing that the court was aware of the prior history and procedural posture of this case. Thus, we believe it reasonable to interpret the trial court's remark concerning defendant's change of heart as referencing only his post-remand conduct. That being the case, we note that "[o]ne arrested for a capital crime, and particularly a convicted defendant awaiting sentencing, has every incentive to behave flawlessly in prison if good behavior might cause the sentencing authority to spare his life. Good behavior in those circumstances would rarely be predictive as to the conduct of the prisoner *after* sentence has been imposed." (Emphasis in original.) *Skipper*, 476 U.S. at 14-15, 90 L. Ed. 2d at 13, 106 S. Ct. at 1676 (Powell, J., concurring, joined by Burger, C.J., and Rehnquist, J.).

However, even were we to agree with defendant that the trial court's remarks referenced the entire post-conviction period, we would not find error. It is conceivable to us that a defendant, in anticipation of reversal of his

conviction and sentence on appeal, might conduct himself favorably. Notably, in defendant's first appeal to this court, he challenged the propriety of his death sentence.

Defendant attempts to bolster his argument with evidence of his good conduct. He cites us to portions of the testimony of Sue Moriearty, a clinical psychologist, and Robert Kilander, an assistant State's Attorney. Specifically, defendant points to the fact that Moriearty testified that defendant had adapted to the prison situation and that he had "done quite well in that setting." Defendant additionally notes that Kilander testified that defendant voluntarily provided testimony in the trial of Rolando Cruz. Further, defendant points to the fact that Kilander testified that during the time that defendant was transported from the Menard prison facility to Rockford, where the Cruz trial was being conducted, defendant was cooperative, did not pose any security problems and did not try to escape.

The evidence of defendant's good conduct is not disputed. We note, however, that defendant only cites us to the more favorable aspects of Moriearty's and Kilander's testimony. Our review, however, reveals that their testimony tends also to suggest defendant's less than positive attributes. In that regard, we include here additional relevant portions.

On direct examination Moriearty testified that, based on her evaluation of defendant, he "came out" as being "unusually expedient," which means that he tends to do things that are to his benefit rather than looking at the social ramifications. She further stated that defendant is "very sensitive about things" and that he is very shrewd.

On cross-examination, Moriearty further testified that defendant is someone that would be very clever at finding the "loop holes" or perhaps going against "the intent of something but still making the system to his ad-

vantage, his history in prison indicates that he's not in trouble for violations, I'm just saying that he's bright enough and expedient enough to take advantage of the loop holes." Further, Moriearty testified that, from her conversations with defendant, she "did not note that he was concerned about other people."

On cross-examination, Kilander testified that, before testifying in the Cruz case, defendant wanted to make certain that Kilander would testify on defendant's behalf at defendant's resentencing hearing. Further, Kilander testified that defendant appeared to him to be a "calculating individual, a person that thinks things out."

Based on the whole of this testimony, we believe it reasonable to conclude, as did the trial court, that defendant's good behavior was merely in anticipation of sentencing. Complete assessment of the trial court's sentencing determination, however, requires that we consider all of the evidence presented. To that end, we have reviewed defendant's additional mitigation evidence as well as the testimony of the State's aggravation witnesses.

Defendant presented the testimony of Hazel Turner, his mother, and Viola Turner-Fritz, his sister. Both testified favorably regarding defendant's relationship with his family. Hazel testified additionally that defendant was "doing pretty good" in prison. Viola testified regarding defendant's military service. According to her, defendant served in the military for three years, after which time he received an honorable discharge. Defendant reenlisted; however, he received a dishonorable discharge, apparently for being absent without leave. Viola explained that defendant had been separated from his family for a long period of time. He was absent without leave because he missed his family and had come home to visit with them.

Daniel Hines and Michael Turner, codefendants, testified on behalf of the State regarding the facts of the rape and murder. In addition to their testimony, the State presented testimony of Harold Meyers. Meyers testified that in 1985, he was incarcerated at the same facility as defendant. Meyers recalled that defendant was concerned about what defendant's brother, Michael Turner, would say about the murder. Defendant asked Meyers to pass notes to Michael regarding what Michael should tell authorities about the offense and instructing Michael that they, Michael and defendant, should accuse Daniel Hines of the killing.

Meyers also testified that defendant talked of plans to escape. To that end, defendant made three homemade shanks. Meyers stated that he told prison officials of defendant's possession of the weapons.

James Zirkelbach, chief investigator in the Macoupin County sheriff's department, testified that in August 1985, he received notice of defendant's planned jail break and of the concealed weapons. A search of defendant's person resulted in the recovery of two homemade shanks, a spiral wire, and a modified razor blade.

Finally, Wayne Watson, an investigator with the Illinois Department of State Police, testified that in August 1989, he met with defendant in response to a letter written by defendant concerning a pending murder investigation involving a little girl. In the letter, defendant offered to help solve the murder and also indicated that he had facts regarding his own case. At the time of their meeting, defendant told Watson that Michael Turner should "be looked at in" the murder of the little girl because Michael was a very smart person and that he was capable of "doing" that homicide.

The trial court was not bound to find that defendant's favorable post-conviction conduct outweighed factors in aggravation. We believe that the sentencing body

could properly have rested its determination concerning defendant's lack of rehabilitative potential on all of the evidence presented. Moreover, in imposing a sentence, the trial court is authorized to consider not only the defendant's character, but also the nature and circumstances of the offense. (*People v. Lykins* (1979), 77 Ill. 2d 35, 40.) Defendant's good conduct neither diminished the circumstances of the offense nor lessened his responsibility for its commission.

Defendant next argues that the trial court failed to give proper weight to additional mitigating factors. He maintains that the court failed to properly consider defendant's lack of significant prior criminal history, his personal relationships with family members and his prior military service. Defendant asserts that these mitigating factors, along with defendant's favorable adjustment to being incarcerated for the past five years, "do not bespeak a man with a malignant heart who must be permanently eliminated from society." (*People v. Carlson* (1980), 79 Ill. 2d 564, 590.) It is defendant's contention that the court's determination was influenced by "sensational" remarks made by the State during the hearing.

The "sensational" remarks occurred during the State's examination of Michael Turner, at which time the following colloquy occurred:

"MR. GUNTREN [Defense counsel]: Your Honor, I would object to a continuing discussion about the earring. I don't see how it's relevant at all at this stage in the sentencing.

THE COURT: What is the purpose of this as to aggravation and mitigation issues?

MR. MORETH [Assistant State's Attorney]: This kind of reminds me of what they did with the clothes that Christ was wearing after they crucified him. They handed it about and tossed it up and down and divided the proceeds. Here's an item of jewelry worn by this girl that brutally [*sic*] murdered.

THE COURT: The objection is overruled. You may proceed."

By his argument, defendant seeks to have us assign greater weight to the mitigation evidence than did the trial court. Even were we so inclined, a different result would not be forthcoming. (See *People v. Waud* (1977), 69 Ill. 2d 588, 596.) The trial court reviewed the evidence and observed the witnesses. The court expressly cited the factors in aggravation and mitigation which it considered in arriving at its sentencing determination. Our review of that determination is weighted with a heavy measure of deference. In our view, other than a belief that the mitigating factors outweigh the aggravating factors, defendant presents no reason upon which we may base a decision to alter the court's sentence. Further, though we question the propriety of the prosecutor's statements concerning the earring, we do not believe that the statements so tainted the proceedings as to have improperly influenced the trial court's sentencing determination.

Defendant's next argument in support of his improper balancing contention is that the trial court confused factors in mitigation and aggravation. He cites to a portion of the trial court's sentencing remarks where the court stated that defendant's "actions were not under any compulsion of a threat or menace," that defendant "did not act under any extreme mental or emotional upset or disturbances," and that "there is no evidence in the record to show that [defendant's] victim in any way did anything to [defendant] which was provocation for [defendant] to commit the horrendous crime of murder." (*Cf.* Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(c)(2), (c)(3), (c)(4).) Defendant argues that by noting the absence of these statutory mitigating factors, the trial court was stating, in effect, that "had any of [these] factors been present, the imposition of death would have not been ap-

propriate." Thus, as we interpret defendant's argument, the trial court transformed the absence of mitigating factors into aggravation.

As we have stated, at the second phase of a capital sentencing hearing, the sentencing body must determine whether there exist any mitigating factors sufficient to preclude imposition of the death penalty. (See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(h).) Here, the trial court's almost verbatim recitation of the statutory mitigating factors appears to have been in consideration of whether any such factors existed. Other than the fact that the court cited the absence of the factors in discussing defendant's conduct, there simply is no support for the proposition that the trial court treated their nonexistence as aggravation. Significantly, the court did not repeatedly remark concerning the absence of these factors, nor did it express that their absence enhanced the offensiveness of defendant's conduct. In our view, the trial court followed the mandate of the sentencing statute. To find otherwise would require that we second-guess the mental processes of the trial judge. We decline to do so.

Moreover, even if the trial court considered the absence of the statutory mitigating factors as aggravation, we would find no impropriety. The trial court is free to consider any relevant aggravating circumstances, both statutory and nonstatutory, at the second phase of a capital sentencing proceeding. (*People v. King* (1986), 109 Ill. 2d 514, 549.) The court could properly have considered the absence of these factors as relevant to the issues of defendant's character and state of mind during commission of the charged offenses.

Finally, defendant raises a question concerning the relevancy of the testimony of his codefendants, Daniel Hines and Michael Turner. He maintains that their testimony was not relevant on the issue of his character. Further, he argues, even if their testimony was relevant,

such testimony was only relevant to defendant's character five years ago. Additionally, defendant maintains, their testimony is unreliable as to his present character, his adjustment to incarceration; it is not indicative of his future conduct.

As we have stated, Hines and Michael Turner testified concerning the facts of the offense and the extent of each codefendant's involvement. Neither witness testified concerning defendant's post-conviction conduct or his potential for rehabilitation. That said, we disagree with defendant's position concerning relevancy of their testimony. The fact that Hines' and Michael Turner's testimony relates to defendant's conduct five years ago does not negate its relevancy on the issue of defendant's character. Both the nature of the offense and the extent of each offender's involvement are relevant factors for sentencing purposes. The trial court could properly have drawn inferences concerning defendant's character from testimony concerning each defendant's role and participation in the commission of the offense.

In sum, the trial court expressly stated that it had considered all of the evidence presented in aggravation and mitigation. Other than defendant's assertions to the contrary, he points to nothing to support his contention that the court failed to properly balance those factors. We find no impropriety in the court's consideration of the evidence.

Defendant's second contention is that the totality of the circumstances supports the conclusion that his death sentence should be vacated. He directs our attention to four cases in which this court determined death to be an inappropriate sentence. See *People v. Johnson* (1989), 128 Ill. 2d 253; *People v. Buggs* (1986), 112 Ill. 2d 284; *People v. Gleckler* (1980), 82 Ill. 2d 145; *People v. Carlson* (1980), 79 Ill. 2d 564.

We note that the crucial facts about *Buggs*, 112 Ill. 2d 284, and *Carlson*, 79 Ill. 2d 564, are the presence of two statutory mitigating factors: no significant history of prior criminal activity (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(1)) and action under extreme mental or emotional disturbance (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(2)). Additionally, the court in *Buggs* and in *Carlson* found important that the events which precipitated the criminal conduct there were unique and tragic and ones which were not likely to be repeated in the future.

Significantly, in *Johnson*, 128 Ill. 2d at 280-82, the court noted that several witnesses testified to the defendant's good character; the defendant expressed remorse to the victims; and the defendant had no significant prior criminal record. Similar to the facts in *Buggs* and *Carlson*, the court in *Johnson* found the defendant's conduct to have been precipitated by his loss of employment.

Defendant argues that his case compares favorably with *Gleckler*, 82 Ill. 2d 145. We disagree.

In *Gleckler*, the defendant was sentenced to death for the murder of two teenaged boys. In concluding that the sentence was excessive, this court noted that the defendant had "no criminal history, the personality of a doormat, and a problem with alcohol." (*Gleckler*, 82 Ill. 2d at 171.) In addition, the court applied a limited form of proportionality review in determining that the defendant's sentence was excessive. The court believed that the defendant's conduct was less culpable than the conduct of a codefendant who had been sentenced to prison for the same offenses and the defendant's rehabilitative potential was not demonstrably worse than his codefendant's. *Gleckler*, 82 Ill. 2d at 171.

Defendant first argues that the evidence presented at his sentencing hearing indicated that the crime was an impulsive act and that the idea was actually proposed

and "masterminded" by Daniel Hines. Further, defendant argues that Hines' testimony minimized Hines' participation in the offense and was "greatly" contradicted by the testimony of Michael Turner.

We have reviewed the facts of this case. Daniel Hines testified that on the evening of July 13, 1985, Hines, defendant and Michael Turner were riding in Hines' car. Hines was driving, defendant occupied the right passenger side and Michael sat in the back, directly behind Hines. Hines pulled off to the side of the road until a young lady, Bridget Drobney, passed by in a car. Hines pulled onto the road behind Drobney. Defendant placed a flashing red light, which belonged to Hines, on the dashboard of the car and plugged it into the cigarette lighter. Drobney pulled her car over to the side of the road and got out of her car. She had her driver's license in her hand. Hines took the license back to his car and gave it to defendant, who pretended to read something from the license into the "CB" radio. Hines proceeded to return the license to Drobney, at which time defendant told Drobney that she would have to come with them. Drobney got into the back passenger seat of Hines' car and Hines drove from the area.

Hines further testified that he drove to a deserted country road with cornfields on either side. Hines stopped the car and he and defendant got out. Hines asked defendant what was "going on." Defendant responded, "Nothing," went back to the car, got Drobney out of the car, and proceeded to lead her into the cornfield. Hines followed defendant into the cornfield. Michael Turner remained at the car.

Once in the field, defendant told Drobney to sit down. Drobney asked defendant not to hurt her. Defendant told Drobney to shut up and made her perform fellatio on him. Defendant then asked Hines if he "wanted any," to which Hines responded that he did not care.

Defendant then told Drobney to disrobe. As defendant sat on the ground, Drobney again performed fellatio on defendant while Hines "got behind her and acted like [he] raped her." Hines testified that he may or may not have penetrated Drobney. Hines then left defendant and Drobney in the cornfield and returned to the car.

Hines returned to the cornfield, once. When he returned, defendant was "having sex" with Drobney. Hines left defendant and Drobney there and did not return to the field.

After Hines left the field, he heard some "gurgling" noises, "something like choking noises, stuff like that." The noises sounded to him like they were being made by a female. According to Hines, after he (Hines) left the field, defendant remained in the cornfield with Drobney for about an additional 25 minutes.

Hines further testified that Michael Turner made a couple of trips into the cornfield and then Hines and Michael began to holler for defendant to come out of the field. When defendant emerged from the field, he was carrying a knife, his "T-shirt" in his right hand, and some other clothing. When defendant got into the car he said, "I just knocked the bitch out, she'll be up in a couple of hours."

On the Tuesday following the incident with Drobney, Hines had a conversation with defendant. According to Hines, defendant told him that he (defendant) had killed Drobney. "He was joking about that whole night." Defendant told Hines that he had had trouble holding Drobney down. He proceeded to sit on her and he stabbed her in the neck twice, using the palm of his hand to drive the knife into her neck.

Michael Turner's testimony revealed that on the day of the Drobney murder, Hines, defendant and Michael went to Hines' home, where they retrieved a red light. Hines said that he wanted to get the light in order to

"pull over a car" that had a female in it. When Hines told Michael and defendant of his plan, defendant said nothing; he "just nodded his head" forward.

Michael, defendant and Hines were sitting in Hines' car on the side of the road when Drobney drove past. Hines plugged the red light into the cigarette lighter and defendant placed the light on the dashboard. Hines followed Drobney for a "little ways" and then she pulled her car over to the side of the road. Hines then got out of the car and walked up to the side of Drobney's car to get her driver's license from her. Hines brought the license back to his car and handed it through the window to defendant. Defendant pretended to read the license into a "mic."

Hines went back to Drobney's car and told her that she had to come with him. Hines walked Drobney back to his car and put her in the back seat on the passenger's side. Hines then drove to a field of tall corn.

Hines and defendant got out of the car and walked to the front end. Hines subsequently took Drobney from the car and walked her up the road a little ways. Meanwhile, defendant took Michael around to the back bumper of the car and pushed him into a ditch. Hines and defendant then took Drobney into the cornfield.

Michael could not see what went on in the field; however, he testified that when defendant came out of the field, he (defendant) asked Michael if he "wanted any." Defendant told Michael that "Danny Hines was crazy" and that "if [defendant] was going to have to go to jail for something, he was already on probation, he was going to go for something that he did."

Later, Michael went part of the way into the field. He could see Drobney lying in between the rows of corn in the field and defendant standing beside her, near her head. At that time Hines asked Michael if he "wanted

any," to which Michael responded, "No." Defendant then yelled at Michael and told him to go back to the car.

Hines came out of the field and yelled for Michael to "come to where he was at." Hines had some of Drobney's clothes in his hand, and he wanted Michael to put them in the car. Hines also had Michael take a machete and the red light from the car and take them out into the cornfield. Hines then went back into the field. When Hines returned, he made Michael retrieve the light and the machete from the field. Hines then drove the car down the road to a place near where he believed defendant to be in the field. Hines and Michael got out of the car and Hines yelled for defendant. During the time that Hines was yelling for defendant, Michael heard a thumping noise, which sounded to him like somebody hitting something, and some gurgling coming from where defendant was with Drobney.

When defendant came out of the field, he was carrying his buck knife. Defendant, Hines and Michael then got into the car and started to leave. Michael asked defendant if they had hurt or bruised Drobney. Defendant responded in the negative, but stated that Drobney was hard to knock out. Michael further testified that as they were driving, he believes Hines said something about going back to check on Drobney to see if she was walking down the road. Defendant responded that they "didn't have to worry about that because she wasn't going anywhere."

Michael further testified that on the following day defendant told Michael that he had killed Drobney. According to Michael, defendant described that he stabbed her twice by driving the knife through her neck. Later, when Michael and defendant saw Hines, Michael heard Hines say that he "wasn't worried about it anyway because [a combine] or something like that would pick her up."

A day or two later, when Michael, Hines and defendant were together again, Michael told Hines what defendant had told him (Michael) about the murder. Defendant then described the murder to Hines.

Harold Meyers, a former inmate incarcerated at the Macoupin County jail with defendant, testified that over the course of several different conversations, defendant told Meyers that he murdered Drobney. According to Meyers, defendant told him that Drobney begged defendant not to hurt her and that at one point, she called out for her father. Defendant told Meyers that after he had killed Drobney, she was making a gurgling sound in her throat. According to Meyers, the murder did not seem to "phase" defendant.

Howard Greenly testified that he met defendant when both he and defendant were incarcerated in the Macoupin County jail. Greenly's cell was located directly across from defendant's. Greenly overheard defendant tell Meyers that he had stabbed Drobney in the neck.

Review of Hines' and Michael Turner's testimony reveals some slight discrepancy in facts regarding the events which led up to the rape. There is, however, no contradiction concerning who was directly responsible for the murder. We note further that defendant was given full opportunity to examine the witnesses regarding their participation in the offense. To the extent that the witnesses' testimony was contradictory or tended to minimize a particular defendant's participation in the offense, we note that it was for the trier of fact to weigh their credibility and to resolve any conflicts or inconsistencies. See *People v. Campbell* (1992), 146 Ill. 2d 363, 375; *People v. Eyler* (1989), 133 Ill. 2d 173, 191.

In our view, the evidence presented at trial and at resentencing supports the conclusion that it was Hines' idea, in the first instance, to stop a woman under the ruse of a police investigation. Further, we believe that

the evidence could conceivably support a finding that it was Hines' idea to rape the victim. However, the weight of the evidence supports the conclusion that defendant, not Hines, "masterminded" and single-handedly committed the murder. We note additionally that there is no evidence to suggest that, like the defendant in *Gleckler*, defendant here was coaxed, forced or otherwise threatened to participate in the kidnapping and rape. To the contrary, the evidence suggests that defendant was a willing participant in the kidnapping and rape of Drobney and that it was his conduct which directly caused her death.

Defendant next argues that, as in *Gleckler*, the potential for rehabilitation is present in this case. He supports this argument with the facts that he offered to testify in the Cruz trial; he was cooperative and nonthreatening while at the Rockford facility waiting to testify in the Cruz trial; and his adjustment to incarceration has been favorable.

The trial court reviewed the evidence at defendant's trial and considered the evidence presented at resentencing. The court considered defendant's conduct and participation in the Cruz trial as well as defendant's postconviction conduct overall. The court expressly stated that it found no credible, probative evidence that defendant has the potential to be restored to useful citizenship. In so concluding, the court stated that it was cognizant of the constitutional and statutory directives that all penalties shall be determined both according to the seriousness of the crime and with the object of restoring the offender to useful citizenship. The court made a reasoned determination based upon all of the evidence presented. We will not substitute our judgment for that of the trial court on this issue.

Finally, defendant maintains that, like the defendant Gleckler and his codefendant, Parson, defendant's con-

duct in this case compares similarly with the conduct of Hines. Yet, as in *Gleckler*, defendant inappropriately received the death penalty while Hines received only imprisonment.

Defendant's claim of comparable culpability is clearly refuted by the evidence. We do not disagree that defendant's blameworthiness in the kidnapping and rape may be comparable to Hines'. Significantly, however, defendant, not Hines, did the act which resulted in the victim's death. Unlike the defendant Gleckler, this defendant is not a less culpable party.

This case does not share sufficient commonalities with *Gleckler* such that reversal is required. In addition, the existence of any provocative, precipitating event is noticeably absent here. (*Cf. Johnson*, 128 Ill. 2d 253; *Buggs*, 112 Ill. 2d 284; *Carlson*, 79 Ill. 2d 564.) Based upon our review, we are unable to conclude that defendant's sentence is inappropriate.

## CONCLUSION

The trial court's sentencing determination is amply supported by the record. Accordingly, we affirm defendant's sentence.

The clerk of this court is directed to enter an order setting Wednesday, May 12, 1993, as the date on which the sentence of death entered by the circuit court shall be implemented. The defendant shall be executed in the manner provided by law (Ill. Rev. Stat. 1991, ch. 38, par. 119—5). A certified copy of the mandate of this court shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Affirmed.*