(No. 89704.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ARLIE RAY DAVIS, Appellant.

*Opinion filed February 22, 2002.—Rehearing denied April 1, 2002.*

HARRISON, C.J., and KILBRIDE, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Lawrence Bapst, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and Terrance Patton, State's Attorney, of Cambridge (Joel D. Bertocchi, Solicitor General, and William L. Browers and Michael M. Glick, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE GARMAN delivered the opinion of the court:

Defendant was convicted after a jury trial in Henry County of multiple counts of first degree murder (720 ILCS 5/9—1(a) (West 1994)), and of other crimes in connection with the killing of Laurie Gwinn. After the jury found defendant eligible for the death penalty, he waived his right to a jury for the second phase of the sentencing hearing. The circuit court imposed the death penalty for the murder. In addition, the circuit court imposed prison sentences for some of the convictions and vacated others as lesser-included offenses. Defendant filed a motion for a new trial and sentencing hearing, which the circuit court denied.

On direct appeal, this court affirmed the convictions and the prison terms, but vacated the sentence of death and remanded for a new sentencing hearing only, there being no question that defendant was eligible for the death penalty. *People v. Davis*, 185 Ill. 2d 317 (1998). The basis for vacating the death sentence was the circuit court's apparent refusal to consider certain evidence in mitigation. We held that although the sentencer may give little weight to evidence properly offered in mitigation, it may not entirely exclude such evidence from consideration. *Davis*, 185 Ill. 2d at 346. Specifically, defendant offered evidence of his good behavior while incarcerated pending and during trial. The circuit court commented that it did not care "how great a prisoner he is, the real test is ... what's going to happen upon release." We agreed with defendant that this statement expressed the judge's categorical belief that such evidence is never relevant to the capital sentencing decision. *Davis*, 185 Ill. 2d at 347. Consequently, defendant was deprived "of the individualized consideration required by the eighth and fourteenth amendments," and resentencing was required. *Davis*, 185 Ill. 2d at 347.

On remand, defendant's request that the original sentencing judge recuse himself was granted and a new judge was assigned. Defendant again waived a jury and the circuit court again imposed the death penalty. Because defendant was sentenced to death, his appeal lies directly to this court. 134 Ill. 2d R. 651(a). As the facts of his crimes are set out in detail in our earlier opinion (*Davis*, 185 Ill. 2d 317); we will summarize here only the testimony at the second sentencing hearing.

### THE SECOND SENTENCING HEARING

The State presented the testimony of four women, all of them admitted former prostitutes. Each woman told of being assaulted between January 1993 and the summer of 1994 by a man who picked her up in the Madison

Square area in the north end of Peoria. None of the women reported the attack at the time. Between November 1994 and January 1995, however, each woman gave a statement to the police describing the attack and identifying defendant as her attacker. Laurie Gwinn was killed in August 1995.

Kari B. testified that on a summer afternoon in 1993, she agreed to perform a sex act for money and entered a man's car. He drove into the country and stopped near what she described as "an abandoned farmhouse." She noticed that the door handle and the window crank were torn out from the passenger side door. The man turned to her and said "Bitch, I'm gonna kill you," and he put his hands on her throat. She struggled and was able to climb through the open car window. She fell to the ground, then got up and ran to the road, with him chasing her. A passing driver gave her a ride back into town. Kari admitted that she had been using cocaine at the time of the attack and had been "up for a few days." She also acknowledged a criminal record that included prostitution, possession of a controlled substance, and robbery. At the time she testified, she was on parole. She first told the story of her attack to the police in January 1995, when she was being interviewed after one of her arrests. When asked why she did not report the attack when it occurred, she said she "was on cocaine bad" and "just didn't want to get involved with the police." In addition, she "didn't really think that they would listen" to her because of her "background." Kari identified the defendant from a photo array in January 1995. She also identified him in the courtroom, stating that she had "no doubt whatsoever" that he was the man who attacked her and that she could "never forget his face."

On cross-examination, Kari admitted that in 1993 she had been addicted to crack cocaine. She stated that when she first reported the attack to police, she told

Peoria police officer Terry Pyatt that the car's inside door handle was missing. However, she also admitted telling Pyatt that she opened the car door and that both she and her attacker fell out of the car. When asked if her memory had improved in the five years since the incident, she said, "I was on a lot of narcotics back [then]." Kari also acknowledged that she told Pyatt she had been arrested later that same night. However, when defense counsel produced a list of her five arrests in the summer and fall of 1993, she could not pinpoint the date of the attack.

Denise T. testified that she had been employed as a roofer for about a year and a half, but that she had previously worked as a prostitute. In addition to arrests for prostitution, she had also been convicted of obstruction of justice and three counts of retail theft. About 10 p.m. one day in late April 1994, she agreed to pose for nude photographs in exchange for money and entered a man's car. She identified the car as defendant's, based on a photograph of his car that was admitted into evidence. He drove to a remote wooded area. She felt "dazed" and explained that she thought the man struck her in the back of the head. When she came to, she was in the back-seat of the car with her hands handcuffed behind her. The man was strangling her with an orange extension cord, which he would loosen until she regained consciousness and then tighten again. This went on for several hours, until morning, with defendant repeatedly masturbating and ejaculating onto her chest. The pressure from the cord being pulled tight around her neck caused one of her eyes to "pop out" of its socket. She has a permanent injury as a result. After she told the attacker that her husband had seen her get into his car, he took her to a Peoria hotel, took her up in an elevator, pushed her out, and fled. Denise did not immediately seek medical attention for her injuries, because she was afraid of go-

ing to jail. She explained that there were "a couple" of outstanding warrants for her arrest and she did not want the police to be contacted. When her condition did not improve after a few days, she went to the emergency room for treatment. She eventually spoke to the police in November 1994 and identified defendant from a photo array. She admitted to using drugs in April 1994, but testified that there was "no doubt" in her mind that defendant was the man who attacked her.

On cross-examination, Denise could not explain why she initially told Pyatt that the attack occurred in January. She acknowledged that she arrived at the April date only after her hospital records showed a May 1, 1994, emergency room visit for treatment of her eye injury. Defense counsel also questioned her recollection of the time of day at which the attack occurred. Denise insisted it had happened at night and that she had been picked up "at the Mexican store on Perry." She denied telling Pyatt that she had been picked up at 12:30 in the afternoon or telling Officer Rod Huber that she had been picked up outside a bar called Mulvaney's. Denise said she was not sure what defendant hit her with and was not sure if she had told the police it was something metal. She stated that she told Pyatt about defendant's masturbating on her, but she could not recall if she told him about the car's missing door handle.

The State also called a nurse from Methodist Hospital in Peoria who verified Denise's eye injury and explained that it could have been caused by excessive pressure on the blood vessels of the neck.

Michelle U. testified that a man picked her up in a blue car at about 11 a.m. one day in the summer of 1994. She was a cocaine user at the time, but had not used any drugs that morning. He drove her to a secluded area at the end of a dead-end street. The door handle and window crank were missing from the passenger door. She

performed the sex act they had agreed upon, but he demanded more. She insisted that he pay her more money. He then grabbed her throat, pushed her down on the seat, and completed the act. He got out of the car, went around to the passenger side, opened her door, and threw her out. He called her "bitch" and "whore." Her pimp, who had followed them, arrived and took her back to town. She did not report the attack because she was "scared" and "embarrassed." She wanted to avoid contact with the police and did not think she would be believed. Michelle's record includes "a drug case" in addition to arrests for prostitution. She told her story to the police in December 1994 and identified defendant from a photo array. In court, she expressed certainty that "[h]e's the one."

On cross-examination, Michelle acknowledged that she previously had been addicted to crack cocaine and had made her initial identification of defendant while undergoing rehabilitation at an inpatient treatment facility.

Maria N. was a prostitute before she began working as a food service worker in a nursing home. Her record includes charges of prostitution, driving under the influence, possession of a controlled substance, and obstruction of justice. She got into a car with a man at 2 a.m. one day in January 1993 and he drove down a back road to a wooded area behind a furniture warehouse. He told her to remove her blouse while he got into the backseat to undress. Then he reached from behind her, put a belt around her neck, and started choking her. She passed out. When she came to, she was on the floor of the backseat and it was daylight. She got her clothing from the front seat, left the car, and walked to the road, where she found a ride. She did not go to the police because she knew that what she was doing "was wrong." She gave a statement to Pyatt in January 1995 and identified the

defendant from a photo array. Maria admitted that she told Pyatt she woke up naked on the ground rather than in the car, but insisted that her testimony was accurate.

On cross-examination, Maria described the car as a "brownish colored station wagon with wood on the sides." She again acknowledged telling Pyatt that she regained consciousness on the ground, not in the car.

The State called Officer Pyatt to testify regarding his investigation of these attacks. He stated that he was present in February 1995 when defendant's "older blue Dodge" was searched. Among the items recovered from the car were an orange extension cord and a set of handcuffs. In addition, the inside door handle and the mechanism to roll the window up and down were missing from the passenger-side door.

Without objection by the defense, he also testified regarding the statements made to him by the four women. His testimony generally confirmed that they testified consistently with their earlier statements as recorded in his notes. However, Maria N. did tell him that she had been "dumped nude with her clothing."

On cross-examination, Pyatt acknowledged that during his first interview with Denise, she indicated that the attack had occurred in late January 1994. When police investigation of hospital records revealed her emergency room visit on May 1, 1994, the date was revised to late April 1994. There was no mention in his written report and he did not recall Denise mentioning that the door or window handles were missing from the car. His report says that Denise claimed to have been picked up at 12:30 in the afternoon, not at night. His report did not contain any mention of the attacker's masturbating on her, but he stated that he did recall Denise talking about this. Pyatt acknowledged that defendant was charged with aggravated battery based on this incident, but that the matter was dismissed with leave to refile. Pyatt also

stated that Kari described a "big green car" and that neither the missing door handles nor the threat "Bitch, I'm gonna kill you" were mentioned in his report.

The State agreed to defense counsel's request to stipulate that Huber, if called to testify, would say that Denise told him the attack occurred after she was picked up outside Mulvaney's bar at around 10 p.m.

In addition to the testimony summarized above, the State also presented the testimony of the victim's father, who read a short statement; two Henry County deputies, who testified regarding defendant's conduct while confined in the county jail awaiting resentencing; several correctional officers, who testified to his conduct while in state custody; and the records custodian from the Department of Corrections, who testified regarding defendant's disciplinary record. Because the circuit court gave little, if any, weight to this information, we need not detail it here.

Evidence in mitigation included the testimony of defendant's uncle, the transcript of defendant's late mother's testimony at the first sentencing hearing, and a written statement prepared by Dr. George L. Savarese, a mitigation specialist. In addition, defendant's driving abstract, which reveals one conviction for driving under the influence and citations for speeding and driving without a valid license, was admitted as evidence of defendant's minimal prior criminal history.

Because defendant argues that the circuit court failed to properly consider a statutory mitigating factor, specifically the lack of a significant history of criminal activity, we find it necessary to quote at length from the circuit court's remarks upon sentencing. The court first acknowledged its "duty to make a diligent inquiry to find mitigating factors that are sufficient, individually or collectively, to preclude the death penalty, if they indeed exist." The court noted the aggravating factors that the

State had proven at the eligibility stage, in accordance with section 9—1(b) of the Criminal Code of 1961: that defendant "actually and personally struck and strangled Laurie Gwinn, intentionally committing murder while in the course of committing three forcible felonies: robbery, aggravated criminal sexual assault, and aggravated kidnapping." 720 ILCS 5/9—1(b) (West 1994). In addition, the court noted:

"[T]he State has supplemented the record during the course of this hearing by presenting the testimony of four women who describe similar savage attacks *** by Arlie Davis, similar to each other and similar to the factual basis of this case.

In this manner the State attempts to demonstrate that the lack of a history of criminal convictions, a clean record except for a driving under the influence charge and ... traffic charges, ... belies Arlie Ray Davis' true character, a character the State contends is sinister, violent, and perverse.

Now I find that I must comment on the testimony of [the four women]. Each is a cocaine addict, plunged deep into a life of prostitution, theft, and prevarication. Each has accumulated a deplorable criminal record. Each took the witness stand and looking directly at the defendant presented testimony in an emotional, blunt, and convincing manner about incidents in their lives that are likely to be indelibly fixed for a lifetime.

Individually their credibility is certainly questionable, suspect, and enigmatic. But, having assessed their emotion, their grim determination, their manner while testifying, and considering how their experiences coincide in many respects with the facts and circumstances surrounding the killing of Laurie Gwinn, the Court finds these women believable and their testimony relevant.

Additional significance is attached to the curious manner in which they are corroborated by evidence in the State's case-in-chief, namely handcuffs in the glove compartment, an orange extension cord in the back seat, manipulation of his victims to lonely, secluded places, and a penchant for strangulation of his victims followed by perverse sexual attacks.

The Court has determined that collectively their testimony reveals an intentional evil mindset of the defendant and portrays a pattern of criminal behavior that is appropriately considered in this Court's sentencing decision. Let there be no mistake, however, this Court will impose sentence for the murder of Laurie Gwinn, not for charges that have not been filed.

The testimony of these women is considered for the narrow purpose of understanding Arlie Ray Davis' character, the likelihood that he can be restored to useful citizenship, and his potential for rehabilitation in or out of prison."

The court observed that Laurie Gwinn was unlike these four earlier victims in that "Laurie Gwinn would be expected to identify and prosecute her assailant. Arlie Davis knew she had no fear of authorities." Thus, the court implied, defendant killed Laurie Gwinn, but allowed the prostitutes he attacked to live, because he thought he could count on them not to report the crime, or perhaps not to be taken seriously if they had.

The court then turned to its "quest to find one or more mitigating factors which would preclude imposition of the death penalty." Using the statute (720 ILCS 5/9—1(c) (West 1994)) as a guide, the court considered each of the statutory factors individually, finding only section 9—1(c)(1) applicable: "the defendant has no significant history of prior criminal activity." With regard to this factor, the court commented:

"While defendant has minor traffic violations including a conviction for DUI, I find that the events which occurred in Peoria in 1993 and 1994 establish a significant recent history of prior criminal activity, thus this is not a mitigating factor."

In its "quest" to find mitigation, the court then considered the 13 statutory mitigating factors that are applicable to minimizing a sentence of imprisonment. 730 ILCS 5/5—5—3.1 (West 1994). None of these factors offered any support for mitigation.

The Court also considered the evidence presented at

the first sentencing of defendant's model behavior while incarcerated prior to and during trial and the evidence presented at this hearing of his breaches of prison discipline. The court stated that it was "not willing to disregard" the evidence of earlier good behavior "simply because he misbehaved on seven occasions in the past three-and-a-half years."

The testimony of defendant's uncle and mother revealed some positive relationships with family members, but also a "dark side" to defendant, the court found. The report of the mitigation expert described defendant's "dysfunctional family" and a "wretched, misdirected life."

In the end, the court concluded that although there "are glimmers of mitigation in the life of Arlie Davis," the court could "not find that any factors in mitigation are sufficient to preclude the imposition of the death penalty."

## ANALYSIS

Defendant claims that the trial court abused its discretion by considering the testimony of four prostitutes, none of whom was "worthy of belief, as the stories they told were incredible and motivated by self interest." In support of this assertion, he notes that each of the four women was a convicted felon and an admitted drug addict and that none of the women reported the alleged assault at the time it occurred. Although defendant raised this issue in a post-sentencing motion, the State responds that this argument is waived for failure to make a contemporaneous objection. *People v. Mahaffey*, 166 Ill. 2d 1, 27 (1995). We agree. Our case law clearly requires that to avoid procedural default, the defendant must make a contemporaneous objection and raise the issue in a post-trial motion. In the alternative, the defendant must demonstrate plain error or another exception to the rule of procedural default. See *People v. Enoch*, 122

Ill. 2d 176, 190 (1988). The defendant has not attempted to do so.

In any event, even if defendant had argued plain error, he could not have prevailed because there was no error. Defendant admits that the testimony of the four women was relevant and admissible. Therefore, his argument really goes to their credibility. Defense counsel cross-examined each witness and pointed out any discrepancies between her testimony and her earlier statements to the police. Defense counsel also made a forceful argument in closing that these witnesses' memories were unreliable because they were impaired by drug use at or near the time of the attacks and their frequent arrests might make them eager to shape their testimony to fit the State's case. The circuit court considered their testimony, their demeanor, and the arguments of counsel, and, in the end, determined that the testimony was credible.

We must defer to the sentencing judge in this matter. When the defendant has waived a jury for the sentencing phase, assessing the witnesses' credibility is exclusively within the province of the circuit court as the trier of fact. *People v. Oaks*, 169 Ill. 2d 409, 467 (1996). In the present case, the court was aware of several reasons to regard the witnesses' testimony with skepticism. On the other hand, their demeanor was apparently quite convincing. Some details of their testimony were corroborated by physical evidence. And their encounters with defendant were chillingly similar to the manner in which he abducted and killed Laurie Gwinn. The trial court was well within its discretion to credit the testimony of these witnesses.

Before we address defendant's second issue, we pause to comment on the tenor of defendant's brief. Although we appreciate that appellate counsel must zealously represent the client, we find counsel has stepped very

close to the line between zealous advocacy and incivility toward the court and opposing counsel. For example, counsel charges that the State, "lacking any legitimate evidence in aggravation to present, elected to present the testimony of criminals and drug addicts to sway the fact finder toward a verdict of death" and, further, that the circuit court "was beguiled" by this evidence. The brief asserts that the court's comments reveal that the court did not find the witnesses "worthy of belief individually, but because the prosecution managed to find four prostitutes to testify, the testimony suddenly became believable." In that same vein, counsel argues that "the fact that the prosecution could find no witness who had allegedly been attacked by Mr. Davis other than prostitutes, known to curry favor with the police, is significant in its omission."

Counsel's tone, which mocks the trial court and witnesses that it found credible, does not assist this court in addressing the merits of the issues, a duty which we take most seriously. The comments of the circuit court reveal the court's understanding that the State found no *living* witness, other than these four women, who had been attacked by defendant because the very traits that made them vulnerable to attack—their work as prostitutes, their drug use, and their run-ins with the law—meant that they did not pose a threat to defendant and, thus, he could allow them to survive. Laurie Gwinn might have made a compelling witness, one whose credibility would not have been in question, had she survived her encounter with defendant.

Defendant's second argument is that counsel was ineffective for failing to object to the testimony of police officer Pyatt. According to defendant, Pyatt's testimony was hearsay and cumulative and merely bolstered the testimony of the four women who accused him of assault. As a result, he argues, the testimony would not have been allowed if counsel had made a timely objection.

Claims of ineffective assistance of counsel are evaluated under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068 (1984), which requires the defendant to demonstrate both that counsel's performance fell below an objective standard of reasonableness and a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reviewing court assesses counsel's performance using an objective standard of competence under prevailing professional norms. To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). As a result, counsel's strategic choices that are made after investigation of the law and the facts are virtually unassailable. *People v. Richardson*, 189 Ill. 2d 401, 413 (2000).

In the present case, the transcript makes it clear that counsel did not object to Pyatt's testimony because counsel's strategy was to impeach the credibility of the four earlier witnesses by showing numerous discrepancies between their testimony at the sentencing hearing and their earlier statements to the officer. Indeed, when the State called only one of the two investigating officers to testify, the defense requested that the State stipulate to the testimony of the absent officer so that it, too, could be used to expose an inconsistency in the testimony of one of the women. The strategy was not unreasonable, even though it was ultimately unsuccessful. Because defendant cannot meet the first prong of the *Strickland* test, he cannot prevail on a claim of ineffective assistance of counsel.

Defendant's third argument is based on our opinion in his first appeal, in which we concluded that the "dispositive inquiry" was whether the sentencing judge

refused, as a matter of law, to consider certain mitigating evidence. *Davis*, 185 Ill. 2d at 346. We cited *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982), for the firmly established rule that "while a capital sentencer 'may determine the weight to be given relevant mitigating evidence,' the sentencer 'may not give it no weight by excluding such evidence' from its consideration." *Davis*, 185 Ill. 2d at 346, quoting *Eddings*, 455 U.S. at 114-15, 71 L. Ed. 2d at 11, 102 S. Ct. at 877. Defendant argues that the judge in his second sentencing hearing committed precisely the same error that resulted in the need for a second hearing—outright refusal to consider relevant mitigating evidence. In particular, defendant asserts that the circuit court refused to consider evidence that he had "no significant history of prior criminal activity" (720 ILCS 5/9—1(c)(1) West 1994)), other than insignificant traffic offenses. As a result, defendant seeks a third sentencing hearing. His argument hinges on a single sentence from the trial court's lengthy remarks upon sentencing:

"While defendant has minor traffic violations including a conviction for DUI, I find that the events which occurred in Peoria in 1993 and 1994 establish a significant recent history of prior criminal activity, *thus this is not a mitigating factor*." (Emphasis added.)

We reject defendant's argument that these few words demonstrate that the resentencing judge committed the same error as the original sentencing judge. The flaw in defendant's first sentencing hearing was that "the judge expressed the categorical belief" that evidence of defendant's positive adjustment to incarceration was "never relevant to a capital sentencing decision. The judge's comments thus demonstrate[d] that he did not consider defendant's proffered mitigating evidence *** based upon the judge's mistaken belief that such evidence is not mitigating." *Davis*, 185 Ill. 2d at 347. At the second sentencing hearing, the judge did not categorically refuse

to consider evidence of defendant's lack of a significant criminal record.

Defendant also raises several other arguments with respect to this statutory mitigating factor. He argues that: (1) only a significant history of prior criminal convictions, as opposed to prior criminal activity, may be used to "negate" this factor, (2) when evidence of lack of a history of criminal convictions is presented, the court must make a specific finding that this mitigating factor is present, even if it then considers evidence of uncharged crimes as a nonstatutory aggravating factor, and (3) due process requires any fact that increases the maximum penalty for a crime must be proven to a jury beyond a reasonable doubt, citing the decision of the United States Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 455, 120 S. Ct. 2348, 2362-63 (2000).

Defendant cites *People v. Lewis*, 88 Ill. 2d 129, 144 (1981), in which this court considered whether the statutory phrase " 'no significant history of prior criminal activity' " is impermissibly vague. We held that while this phrase "can, perhaps, be construed or applied by courts so as to render it overly broad, there is no reason to assume it will be. *** We believe the phrasing of section 9—1(c)(1) is not a constitutionally impermissible basis for calling to the jury's attention the absence of significant criminal *convictions*." (Emphasis added.) *Lewis*, 88 Ill. 2d at 144-45. He notes that we later decided a case in which evidence of a prior juvenile proceeding that did not result in an adjudication of delinquency and of a prior criminal charge that did not result in a conviction were considered by the sentencing court, holding that:

> "Even if these two dispositions were improperly considered by the trial judge, the error was harmless because the defendant still had a significant history of criminal activity; *i.e.*, convictions for two burglaries, misdemeanor theft,

possession of a controlled substance, and two for unlawful-use-of weapons charges." *People v. Stewart*, 101 Ill. 2d 470, 494 (1984).

Reading *Lewis* and *Stewart* together, defendant concludes that only prior criminal convictions, or the lack thereof, may be considered by the sentencer to determine whether the mitigating factor is present and, further, any error resulting from consideration of other criminal activity is harmless only if the defendant also has a significant history of criminal convictions. Thus, he concludes, it was error for the circuit court to find that the mitigating factor did not exist based on evidence of criminal activity that did not result in conviction and, further, the error could not have been harmless because he had no other significant criminal convictions on his record.

The State responds that the trial court's single comment that "this is not a mitigating factor" must be read in the context of the court's lengthy remarks, and that the court did, in fact, acknowledge that defendant did not have a significant history of criminal convictions before concluding that this fact was outweighed by the existence of a nonstatutory aggravating factor, that is, substantial evidence of uncharged criminal activity.

Defendant does not attempt to argue that the circuit court erred by admitting and considering evidence of uncharged criminal conduct. To do so would have been futile in any event. See *People v. Smith*, 176 Ill. 2d 217, 255 (1997) ("the sentencer may consider in aggravation evidence of a defendant's prior misconduct, including juvenile delinquency, 'although the misconduct may not have resulted in prosecution or conviction' "), quoting *People v. Lego*, 116 Ill. 2d 323, 346-47 (1987).

Upon careful reading of the circuit court's comments, we note that the court referred to the evidence of uncharged crimes as the State's having "supplemented the record," a clear reference to the court's understand-

ing that this evidence was offered as a nonstatutory aggravating factor, presented in the State's case in chief to supplement the aggravating factors proven at the first stage of sentencing.

The court also stated that defendant's lack of criminal history, as reflected by his record of convictions, was "belied" by the evidence of his attacks on the four women. To "belie" a fact is to demonstrate its falsity. See B. Garner, Dictionary of Modern Legal Usage 102 (2d ed. 1995) ("belie = (1) to disguise, give a false idea of; (2) to leave unfulfilled; or (3) to contradict or prove the falsity of"). When a defendant offers evidence in mitigation, the State is permitted to offer evidence to "belie" its factual basis. The State did so, for example, in *People v. Ramirez*, 98 Ill. 2d 439, 467 (1983), by having its own psychiatric expert testify after the defendant offered evidence that he committed the murder while "under the influence of extreme mental or emotional disturbance" (720 ILCS 5/9—1(c)(2) (West 1994)). We found that "[s]ince the defendant himself raised the issue of his mental condition at the time of the offense, it was not improper for the State to try to disprove his assertion." *Ramirez*, 98 Ill. 2d at 467.

In *People v. Flores*, 153 Ill. 2d 264, 296 (1992), the defendant presented mitigating evidence that his prior adjudications for delinquency were for nonviolent crimes, for which he received probation. While we did not "discount the significance" of this mitigation evidence, we also found it significant that between the murder of Gilbert Perez, for which he faced the death penalty, and his arrest, defendant shot Louis Rosero five times, rendering him a paraplegic. Flores, attempting to minimize the significance of Rosero's testimony at the sentencing hearing, argued that "he was never convicted of the Rosero shooting." *Flores*, 153 Ill. 2d at 296. We noted that "this evidence was admissible, for, certainly,

prior uncharged criminal conduct is relevant in a sentencing determination. [Citation.] If believed, the jury may have considered that defendant's mitigation evidence was insufficient to overcome the aggravating factors." *Flores*, 153 Ill. 2d at 296.

In the present case, defendant pointed to his lack of a criminal record as evidence that he had "no significant history of prior criminal activity" (720 ILCS 5/9—1(c)(1) (West 1994)). He introduced the record of his traffic offenses, including a DUI, as evidence that any prior lawbreaking on his part was not "significant." The State, anticipating that he would rely on this particular mitigating factor, put on evidence of quite significant criminal activity in the two years immediately preceding the murder. The circuit court, considering all of the evidence, commented: "In this manner the State attempts to demonstrate that the lack of a history of criminal convictions, a clean record except for a driving under the influence charge and *** traffic charges, *** belies Arlie Ray Davis' true character, a character the State contends is sinister, violent, and perverse."

We conclude, based on the record of the circuit court's comments, that the court did find that the statutory mitigating factor was present, but that its significance was clearly outweighed, or "belied," by the evidence of uncharged crimes properly introduced by the State. This conclusion is supported by the circuit court's statement that it was considering the other-crimes evidence "for the narrow purpose" of understanding defendant's "character, the likelihood that he can be restored to useful citizenship, and his potential for rehabilitation."

Defendant acknowledges that it would have been entirely appropriate for the circuit court to find that the statutory mitigating factor was present, but that the evidence of nonstatutory aggravating factors "reduced the impact of this factor." He argues, however, that the

court's remark that "this is not a mitigating factor" demonstrates that it was not engaging in this kind of balancing and, without citation to authority, he asserts that the circuit court was required to make an express finding that the factor was present before finding it outweighed by other factors. The State responds that "[w]hile the court's language may not have been as precise" as it could have been, this court has previously permitted a sentencing court to weigh the lack of a prior criminal record against evidence of prior uncharged criminal activity. Both parties cite *Smith,* in which we found "no error where the trial court first found the presence of the statutory mitigating factor, and then 'tempered' that finding by noting evidence of defendant's juvenile misconduct." *Smith,* 176 Ill. 2d at 255.

We also find *Stewart* instructive. In that case, the defendant argued that the trial judge failed to consider, or improperly considered, certain factors in mitigation, including his lack of a significant history of prior criminal activity. *Stewart,* 101 Ill. 2d at 493-94. The judge made a remark quite similar to the disputed comment in this case when he concluded that there was " 'nothing to mitigate the offense committed here.' " *Stewart,* 101 Ill. 2d at 494. As in the present case, the judge's remark was made in the context of describing his consideration of all of the evidence presented: " 'I have indulged in many hours of reflective introspection seeking to find some factors in mitigation. \*\*\* I have searched my conscience and my soul and I cannot find any basis in law or in fact that would preclude the death penalty in this case.' " *Stewart,* 101 Ill. 2d at 494-95. We found that the record in *Stewart,* despite the single comment relied on by the defendant, did not demonstrate that the judge failed to consider factors in mitigation. *Stewart,* 101 Ill. 2d at 494-95. Similarly, in the present case, the judge's remarks, taken as a whole, reflect careful consideration of all of

the statutory and nonstatutory factors offered by the parties and the reluctant conclusion that the death penalty was proper. Implicit in the single, isolated comment that "this is not a mitigating factor" is the judge's conclusion that the mitigating factor was not sufficient to outweigh the aggravating factors.

Defendant's final argument with regard to this mitigating factor is that the trial court's reliance on allegations of criminal conduct that were not proven at trial violates the constitutional guarantee of due process as interpreted in *Apprendi*. This argument is entirely without merit. *Apprendi* held that any fact that increases the statutory maximum penalty for a crime, other than the fact of a prior conviction, must be submitted to a jury and proven beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. The Supreme Court in *Apprendi* expressly excluded death penalty proceedings from its reach. *Apprendi*, 530 U.S. at 496, 147 L. Ed. 2d at 459, 120 S. Ct. at 2366.

In the present case, when evidence of uncharged crimes was offered during the second stage of sentencing, defendant had already been proven eligible for the death penalty based on the presence of three aggravating factors. Thus, the maximum sentence he faced was death. No fact that was offered at the second stage of sentencing could have had the effect of increasing the maximum penalty. *Apprendi* concerns are, thus, not implicated here.

In the end, defendant's arguments with regard to this mitigating factor are nothing more than an invitation to "assign greater weight to the mitigation evidence than did the trial court." *People v. Turner*, 156 Ill. 2d 354, 366 (1993). We will not engage in such reweighing. "The trial court reviewed the evidence and observed the witnesses. The court expressly cited the factors in aggravation and mitigation which it considered in arriving at its sentencing determination. Our review of that

determination is weighted with a heavy measure of deference." *Turner*, 156 Ill. 2d at 366.

Defendant also argues that what he calls the "Illinois Death Penalty Statute," actually sections (b) through (j) of the statute defining first degree murder (720 ILCS 5/9—1(b) through (j) (West 1994)), is unconstitutional because it does not require the sentencer to find beyond a reasonable doubt that aggravating factors outweigh mitigating factors. He bases this argument on *Apprendi* as well. Defendant acknowledges that the Court stated that the rule it was announcing in *Apprendi* would not "render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death." *Apprendi*, 530 U.S. at 496, 147 L. Ed. 2d at 459, 120 S. Ct. at 2366, citing *Walton v. Arizona*, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990). Nevertheless, he argues that the *Apprendi* rule should be applied to Illinois' death penalty sentencing scheme because it differs from the scheme described by the Court in *Apprendi*. He notes that "there is only one offense of murder in Illinois; no distinction is made between capital and non-capital murder." *People v. Brownell*, 79 Ill. 2d 508, 524 (1980). Thus, he argues, because he was found guilty of "murder," but not "capital murder," any further findings of fact permitting imposition of a sentence in excess of the 60-year statutory maximum for murder (730 ILCS 5/5—8—1(a)(1)(a) (West 1994)) must be proved by the State beyond a reasonable doubt, including a finding that the aggravating factors are not outweighed by mitigating factors.

The State responds that defendant has waived this argument by failing to raise it in his first appeal. However, *Apprendi* was decided more than a year after his first appeal, while his resentencing was pending, so this argument was not available to him at that time. In

addition, this proceeding is a direct appeal, albeit a second one. The doctrine of waiver does not bar a defendant from raising a constitutional issue on direct appeal, even if he failed to raise it at trial. See *People v. Wagener*, 196 Ill. 2d 269, 280 (2001).

Defendant's argument hinges on the underlying proposition that the statutory maximum sentence for murder is established *in every case* by section 5—8—1(a)(1)(a) of the Unified Code of Corrections. 730 ILCS 5/5—8—1(a)(1)(a) (West 1994) (stating that the sentence for first degree murder, absent a finding of fact regarding certain aggravating factors, shall be a determinate term "not less than 20 years and not more than 60 years"). If this is so, then imposition of an extended-term sentence (730 ILCS 5/5—5—3.2(b)(2), 5—8—2(a)(1), (b) (West 1994)), or the death penalty (720 ILCS 5/9—1(b) through (j) (West 1994)), would always implicate the due process concerns addressed in *Apprendi*. But what of the case in which the defendant who, after being convicted of murder, is found eligible for the death penalty? This question has already been addressed by this court in *People v. Ford*, 198 Ill. 2d 68 (2001), and our holding in that case forecloses defendant's argument.

Eric Ford was convicted of first degree murder after a bench trial. When the State sought the death penalty, he waived a jury for both phases of the capital sentencing hearing. The trial court found him eligible for the death penalty on two separate bases: the murder was committed in the course of another felony and the murder was intentional and involved the infliction of torture. *Ford*, 198 Ill. 2d at 71. Following receipt of mitigating evidence, the trial court declined to impose the death penalty, based on Ford's youth, his lack of a significant history of criminal activity, his confession, and his cooperation with the police. Nevertheless, because the murder " 'was accompanied by exceptionally brutal or heinous behavior

indicative of wanton cruelty,' " the trial court imposed an extended-term sentence of 100 years, rather than the 60-year sentence that would have been proper absent the aggravating factor. *Ford*, 198 Ill. 2d at 71. Ford argued that his 100-year extended-term sentence was unconstitutional under *Apprendi* because the maximum sentence for the offense of murder is a 60-year prison term. The State's position was that *Apprendi* does not ever apply to sentencing under Illinois' first degree murder statute because the maximum penalty authorized by that statute is death. *Ford*, 198 Ill. 2d at 71-72.

The first degree murder statute permits the State to seek imposition of the death penalty for any defendant found guilty under the statute by proving that the defendant is at least 18 years of age and that one or more of the listed aggravating factors is met. 720 ILCS 5/9—1(b) (West 1994). The State must meet this burden by proving the existence of the aggravating factor or factors beyond a reasonable doubt. 720 ILCS 5/9—1(f) (West 1994). Once the State has met this burden, the maximum sentence facing the particular defendant is death.

As applied to Ford, because he had been found eligible for the death penalty, a 100-year sentence, even though it was an "extended-term" sentence, did not exceed the statutory maximum he was facing—death. The trial court's finding that the murder " 'was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty,' " although a finding of fact, "did nothing to increase the penalty" that he was facing. *Ford*, 198 Ill. 2d at 74.

In the present case, the jury found the defendant guilty of murder and of the three felonies that served as aggravating factors (720 ILCS 5/9—1(b)(6)(a) (West 1994)). The jury also found, beyond a reasonable doubt, that he was eligible for the death penalty. "At this point, and based exclusively upon facts that were proved beyond

a reasonable doubt, defendant faced a prescribed statutory maximum sentence of death." *Ford*, 198 Ill. 2d at 74. Consideration of mitigating factors, or even consideration of nonstatutory aggravating factors, at the second stage of sentencing cannot increase the penalty for the crime beyond that maximum. Indeed, mitigating factors can only reduce the likelihood that the maximum penalty will be imposed. The remaining question at this stage— whether sufficient mitigating factors exist to preclude imposition of the death penalty—thus need not be submitted to the jury and proven beyond a reasonable doubt.

We, therefore, conclude that the rule announced in *Apprendi* is not applicable in the mitigation phase of a death penalty sentencing hearing.

Defendant raises another *Apprendi*-based claim—that his indictment was flawed because it did not set forth all of the elements of the crime. The omitted elements, according to defendant, are that he was over the age of 18 at the time of the commission of the crime, that he actually killed Laurie Gwinn, that the killing occurred in the course of one or more of the specified felonies, and that mitigating factors are not sufficient to preclude the imposition of the death penalty. Thus, he contends that he may not constitutionally be sentenced to death.

Defendant's brief also states in its summary of the "Nature of the Case" that "no issue is raised concerning the sufficiency of the charging instruments." Perhaps this language is just boilerplate, or perhaps it reflects counsel's recognition that the time for raising any challenge to the sufficiency of the indictment is long past. "When an indictment or information is attacked for the first time on appeal, it is sufficient that the indictment or information 'apprised the accused of the precise offense charged with sufficient specificity to prepare his defense and allow pleading a resulting conviction as a bar to

future prosecution arising out of the same conduct.' " *People v. Thingvold*, 145 Ill. 2d 441, 448 (1991), quoting *People v. Gilmore*, 63 Ill. 2d 23, 29 (1976). In other words, the question on appeal is "whether the defect in the information or indictment prejudiced the defendant in preparing his defense." *Thingvold*, 145 Ill. 2d at 448.

In the present case, defendant did not challenge the indictment at trial or in his first direct appeal. Thus, unless he demonstrates that he was prejudiced in preparing his defense, this issue is waived. Defendant makes no claim of prejudice, however. Instead, he packages his challenge to the indictment in *Apprendi* wrapping and raises it as a constitutional claim that was not available to him at the time of his first appeal.

Defendant's attempt to create an *Apprendi* issue is unavailing because the Supreme Court, in *Apprendi*, specifically excluded capital sentencing schemes in which eligibility for the death penalty must be proven to a jury beyond a reasonable doubt from its scope:

> " 'Neither the cases cited, nor any other case, permits a judge to determine the existence of a factor which makes a crime a capital offense. What the cited cases hold is that, once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed ... . The person who is charged with actions that expose him to the death penalty has an absolute entitlement to jury trial on all the elements of the charge.' " *Apprendi*, 530 U.S. at 497, 147 L. Ed. 2d at 459, 120 S. Ct. at 2366, quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 257 n.2, 140 L. Ed. 2d 350, 377 n.2, 118 S. Ct. 1219, 1237 n.2 (1998) (Scalia, J., dissenting, joined by Stevens, Souter and Ginsburg, JJ.).

Defendant argues that this *dicta* in *Apprendi* regarding capital sentencing applies only to those states with criminal laws that distinguish between the offenses of murder and capital murder. Because Illinois' criminal

code defines only one offense of first degree murder, he argues that a charge of first degree murder does not adequately inform the accused that he may face the death penalty. He claims that *Apprendi* implicitly overturns our decision in *People v. Brownell*, 79 Ill. 2d 508 (1980).

In *Brownell*, the defendant argued that a capital sentencing hearing, conducted after his conviction for first degree murder, violated double jeopardy principles. He characterized his trial as having convicted him of the "lesser included offense of murder," and his sentencing hearing as having tried him again for the offense of "capital murder." *Brownell*, 79 Ill. 2d at 523. He also made an eighth amendment argument that his indictment was defective because the prosecutor could initiate a death penalty hearing without having charged him with "aggravated murder." *Brownell*, 79 Ill. 2d at 526-27. We noted that "there is only one offense of murder in Illinois; no distinction is made between capital and non-capital murder." *Brownell*, 79 Ill. 2d at 524. Further, "[t]here is no offense of 'aggravated,' as opposed to simple, murder, in Illinois. There is simply one murder statute, which includes within it a provision for the imposition of the death sentence." *Brownell*, 79 Ill. 2d at 527. Thus, an indictment for murder is sufficient if it sets out "with such specificity or particularity that the accused is informed of the offense with which he is charged and enabled to prepare his defense and, further, that he is protected against being later prosecuted for the same crime." *Brownell*, 79 Ill. 2d at 524. In addition, when the indictment contains allegations that the defendant murdered the victim in the course of committing certain other felonies, such as aggravated kidnapping or rape, the defendant is "fully apprised, from indictment on, that he could potentially receive the death sentence." *Brownell*, 79 Ill. 2d at 525.

We relied on *Brownell* in *People v. Davis*, 95 Ill. 2d 1

(1983), in which the defendant argued that the indictment was insufficient to support a death sentence because it failed to allege a statutory aggravating factor. *Davis*, 95 Ill. 2d at 28. After again noting that there is only one offense of murder under Illinois law, and that the defendant did not assert that the necessary elements of that crime were insufficiently alleged in the indictment, we stated:

"The aggravating factors are not necessary elements of the *offense*, and are relevant only to a determination of the appropriate *punishment*. Therefore, the real question concerns defendant's knowledge that the death penalty would be sought, and his ability to adequately prepare a defense." (Emphases in original.) *Davis*, 95 Ill. 2d at 29.

As in *Davis*, this defendant "does not allege that he was unaware of the aggravating factors upon which the State would rely." *Davis*, 95 Ill. 2d at 29. Indeed, in the present case, defendant was also charged with three separate felonies, any one of which, if proven, would have provided an aggravating factor to make him eligible for the death penalty. "This is not, therefore, a situation in which the indictment either failed to specify aggravating factors or defendant received no pretrial notice." *Davis*, 95 Ill. 2d at 29-30.

We recognized in *Wagener* that "*Apprendi* contains isolated statements which on their face might appear to support the conclusion that the jury must find beyond a reasonable doubt each and every fact which might have any real-world impact on the length of time the defendant might spend in prison." *Wagener*, 196 Ill. 2d at 286. Nothing in *Apprendi*, however, causes us to reconsider our holdings in *Brownell* and its progeny. Aggravating factors are not elements of the offense of murder. They are sentencing factors. When the State is considering seeking the death penalty, the defendant must be put on notice of this possibility either by the inclusion of specific aggravating factors in the indictment or some other form

of pretrial notice, so that he may adequately prepare his defense. *Davis*, 95 Ill. 2d at 29-30. If such notice is provided, the defendant can show no prejudice and the indictment is a sufficient basis upon which to predicate the death penalty. *Davis*, 95 Ill. 2d at 30.

Defendant's final arguments are that the Illinois death penalty statute is unconstitutional because it places a burden of proof on defendants to show that mitigating evidence outweighs aggravating evidence; allows sentencers to weigh a vague aggravating factor, namely, "any other reason" beyond the statutory factors why a defendant should be sentenced to death (see 720 ILCS 5/9—1(c), (e) (West 1994)); and fails to sufficiently minimize the risk of arbitrarily imposed death sentences. This court has repeatedly addressed these claims; indeed, we did so in defendant's first appeal (*Davis*, 185 Ill. 2d at 351-52). He offered no reason then, and offers no reason now, why we should reconsider our prior decisions. Therefore, we again reject these claims.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court. We direct the clerk of this court to enter an order setting Tuesday, May 13, 2002, as the date on which the sentence of death entered by the circuit court of Henry County shall be carried out. Petitioner shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 2000). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where petitioner is now confined.

*Affirmed.*

CHIEF JUSTICE HARRISON, dissenting:

When this matter was last before the court, I did not take issue with the validity of Davis' convictions. *People*

*v. Davis*, 185 Ill. 2d 317, 352 (1998) (Harrison, C.J., concurring in part and dissenting in part). My view has now changed. During the pendency of Davis' appeal, our court adopted a comprehensive set of new rules governing the conduct of cases in which the State is seeking the death penalty. For the reasons set forth in my dissenting opinion in *People v. Hickey*, 204 Ill. 2d 585, 631-36 (2001) (Harrison, C.J., dissenting), the procedures contained in those rules are indispensable for achieving an accurate determination of innocence or guilt and are applicable to all capital cases now coming before us. Because Davis was tried, convicted and sentenced without the benefit of the new rules, his convictions and death sentence should be vacated, and the cause should be remanded to the circuit court for a new trial.

Even if Davis were not entitled to the benefit of the new rules, his sentence of death could not stand. As I wrote when this matter was last before us, and for the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law is void and unenforceable because it violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Absent the new rules, there is no basis for altering that conclusion. At a minimum, Davis' sentence of death should therefore be vacated, and he should be sentenced to a term of imprisonment. 720 ILCS 5/9—1(j) (West 1994).

JUSTICE KILBRIDE, also dissenting:

For the reasons set forth in my dissents in *People v. Hickey*, 204 Ill. 2d 585, 636-40 (2001) (Kilbride, J., dissenting), and *People v. Simpson*, 204 Ill. 2d 536, 581-85 (2001) (Kilbride, J., dissenting), I believe this cause should be remanded for a new trial conducted in compliance with the new rules governing capital cases. As I

stated in my dissents, the procedures in capital cases prior to this court's adoption of the new rules were inherently unreliable and did not sufficiently protect a defendant's constitutional rights. For this reason, I believe that the new rules should be applied retroactively. See *People v. Caballero*, 179 Ill. 2d 205, 220-21 (1997). Therefore, I respectfully dissent.