866 A.2d 351

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Christopher RONEY, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 5, 2002.

Decided Jan. 20, 2005.

Norris E. Gelman, Esq., Philadelphia, for Christopher Roney.

Hugh J. Burns, Esq., Frederick Pettit, Esq., Amy Zapp, Esq., Philadelphia, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION

Justice NEWMAN.

Christopher Roney (Appellant) brings this direct appeal[1] from the Judgment of Sentence of the Court of Common Pleas

---

1. This Court has jurisdiction of a direct appeal from a judgment of sentence in a case in which the death penalty has been imposed. 42 Pa.C.S. § 9711(h).

of Philadelphia County (trial court) that sentenced him to death following his conviction for first-degree murder. After reviewing the record and the claims raised by Appellant, we affirm.

## I. Facts and Procedural History

At approximately 8:20 a.m., on January 6, 1996, Appellant and Mark Canty (Canty) forced PNC Bank employees, Norma Winn, Loretta Johnson, and Ann Vicola, at gunpoint, into the PNC Bank building located at 4710 Rising Sun Avenue.[2] Once inside, Appellant and his accomplice ordered Norma Winn and Ann Vicola to open the bank vault.[3] While Canty forced the two women to the vault area at gunpoint, Appellant kept watch over Loretta Johnson. While at the vault, Canty shouted to Appellant, who was at the front of the bank, "Here comes the heat." Appellant responded, "Don't worry, I'll take care of them."[4]

At this time, Police Officer Lauretha Vaird (Officer Vaird), who was the first police officer to respond to a report of a robbery at the PNC Bank, approached the front door of the bank building. As she entered the bank, Appellant fatally shot Officer Vaird in the abdomen and exited the building through the front door.[5] Meanwhile, Canty fled from the bank through a side entrance, leaving his gun behind.[6] Outside the bank, Appellant exchanged gunfire with Police Officer Donald Patterson (Officer Patterson), who arrived on the scene shortly after Officer Vaird.[7] Able to escape the shoot-

2. N.T., 10/17/96 (Morning Session), pp. 43–48, 65–71; N.T., 10/21/96, pp. 36–42, 50–118, 127–133, 172–180, 187–189; N.T., 10/22/96, pp. 3–14, 47–54. In an attempt to conceal their identities, Appellant and Canty were dressed as employees of the Philadelphia Gas Works (PGW) and their disguises included hard hats, coveralls, and reflective vests.

3. N.T., 10/21/96, pp. 119–120, 177–181; N.T., 10/22/96, pp. 14–15.

4. N.T., 10/21/96, pp. 120–121, 181, 225–226; N.T., 10/22/96, pp. 15–16.

5. N.T., 10/16/96, pp. 125–127, 179–180; N.T., 10/17/96 (Morning Session), pp. 10–11; N.T., 10/18/96, pp. 29–33, 36–39, 50–62; N.T., 10/21/96, pp. 122,157–158,181–183; N.T., 10/22/96, pp. 16–18; N.T., 10/24/96, pp. 13–31.

6. N.T., 10/21/96, pp. 122, 165–169, 181–183, 234–241.

7. N.T., 10/16/96, pp. 126–128; N.T., 10/18/96, pp. 31–34, 48–49, 62–93.

out, Appellant jumped into a waiting green minivan, driven by his cohort, Warren McGlone (McGlone), and the vehicle sped away on Rising Sun Avenue.[8]   Later that morning, McGlone, Canty, and Appellant met at McGlone's home to discuss the events at the PNC Bank.[9]

Thereafter, the police found: (1) the getaway green minivan abandoned at 4500 North 11th Street in Philadelphia;  (2) various items of clothing worn as disguises by Appellant and Canty;  (3) a loaded 9–millimeter automatic gun, which was lying on the sidewalk in front of the side entrance of the PNC Bank in question;  and (4) a loaded .380–caliber silver Lorcin revolver on the sidewalk near the bank.[10]   Later, the Bureau of Alcohol, Tobacco and Firearms (ATF) traced the .380–caliber silver Lorcin revolver to Anthony Brown, a relative of Canty.[11]   Importantly, the gun was stolen and last seen in the possession of Canty.[12]   The ATF also traced the 9–millimeter automatic gun to Richelle Parker, a friend of McGlone, who purchased the gun for McGlone.[13]   Subsequently, Canty and McGlone confessed to participating in the events that transpired at the PNC Bank on Rising Sun Avenue on the morning of January 6, 1996.

During the course of the trial, which began on October 15, 1996, three eyewitnesses identified Appellant as the man involved in the robbery of the PNC Bank in question.[14]   Two

8.   N.T., 10/18/96, pp. 34–36.

9.   N.T., 10/18/96, pp. 167–202, 207–244.

10.   N.T., 10/15/96, pp. 107–210;  N.T., 10/16/96, pp. 24–97, 204–209;  N.T., 10/21/96, pp. 37–38, 135–137, 177–179, 242–243;  N.T., 10/22/96, pp. 10–11.

11.   N.T., 10/17/96 (Afternoon Session), pp. 88–90.

12.   N.T., 10/17/96 (Morning Session), pp. 99–107;  N.T., 10/17/96 (Afternoon Session), pp. 28–34.

13.   N.T., 10/17/96 (Afternoon Session), pp. 36–46, 89–92.

14.   Officer Patterson testified that Appellant ran out of the front doors of the bank, aimed a silver handgun at him, and fled the scene in a green minivan with license plate SKN–179.  Along with recognizing his face, Officer Patterson specifically remembered Appellant's height and build. N.T., 10/18/96, pp. 32–49.  Norma Winn—one of the PNC Bank employees held up inside the building during the robbery—also noted Appellant's height, identifying him as the robber with a silver gun.

other witnesses noted that one of the robbers was a tall, African–American male over six feet in height.[15] Ann Vicola testified that the tall man with a silver handgun remained closer to the front entrance of the bank, while the shorter man with the black handgun went to the rear of the building with her and Norma Winn.[16]

The Commonwealth presented Police Officer Carl Rone (Officer Rone) as an expert in identification, operation, and characterization of firearms. Officer Rone testified that the ballistic evidence established that the silver Lorcin .380–caliber handgun found at the scene of the crime was fired inside the PNC bank building. Officer Rone also testified that the bullet recovered from the body of Officer Vaird was fired from the Lorcin .380–caliber handgun.[17] Additionally, Dr. Gregory McDonald, Assistant Medical Examiner, testified that Officer Vaird died as a result of a fatal gunshot wound to the abdomen. Based on his examination of the wound track, the witness related that the bullet struck vital bodily organs. Dr. McDonald noted that the position and the path of travel of the bullet recovered from the body of Officer Vaird was consistent with having been fired by a six-foot five-inch tall person from a distance of more than two feet.[18]

N.T., 10/21/96, pp. 177–180. Finally, Tara Scott saw Appellant in front of the PNC Bank just before the incident and recognized him from having seen Appellant previously near 60th Street and Lansdowne Avenue in West Philadelphia. N.T., 10/21/96, pp. 36–42.

15. Mohammed Chuctai, who worked at the 7–11 convenience store across from the PNC Bank, testified that on the morning of the robbery, shortly after the sound of a gunshot came from inside the bank building, he saw an African–American man, about six feet five inches tall, exit the front doors of the bank with a gun in his hand. Upon leaving the bank, the male encountered a police officer, pointed a gun in the direction of this officer, and appeared to fire it. N.T., 10/16/96, pp. 122–129, 146–147. A few minutes before the robbery, another witness, William Rivera, saw two African–American men, dressed as PGW workers near the 7–11 convenience store across the street from the bank building. He noticed that one of the men was over six feet tall, while the other was less than six feet in height. N.T., 10/16/96, pp. 204–209.

16. N.T., 10/21/96, pp. 118–123.

17. N.T., 10/24/96, pp. 32–50.

18. N.T., 10/24/96, pp. 20, 23–27.

On October 30, 1996, the jury found Appellant guilty of first-degree murder,[19] three counts of robbery,[20] conspiracy,[21] aggravated assault,[22] burglary,[23] and possession of an instrument of crime (PIC).[24] Following a penalty hearing on November 1, 1996, the jury sentenced Appellant to death, finding three aggravating circumstances: (1) the victim was a peace officer or law enforcement official killed in the performance of her duties;[25] (2) the killing was committed during the perpetration of a felony;[26] and (3) Appellant knowingly created a grave risk of death to another person during the killing.[27] The jury also found two mitigating circumstances: (1) Appellant had no significant criminal history;[28] and (2) other mitigating character evidence.[29]

On March 3, 1997, the trial court formally imposed the sentence of death and additionally sentenced Appellant to consecutive sentences of 60 to 120 months incarceration for each robbery conviction, the conspiracy conviction, the aggravated assault conviction, and the burglary conviction. The trial court also sentenced Appellant to a consecutive sentence of 30 to 60 months incarceration for his PIC conviction. In total, Appellant was to serve 32 1/2 to 65 years of incarceration, in addition to his sentence of death.

## II. Discussion

■■■ "This Court is required to review the sufficiency of the evidence to sustain a conviction of first-degree murder in every case where the death penalty has been imposed." *Com-*

19. 18 Pa.C.S. § 2502(a).

20. 18 Pa.C.S. § 3701.

21. 18 Pa.C.S. § 903(a).

22. 18 Pa.C.S. § 2702.

23. 18 Pa.C.S. § 3502(a).

24. 18 Pa.C.S. § 907.

25. 42 Pa.C.S. § 9711(d)(1).

26. 42 Pa.C.S. § 9711(d)(6).

27. 42 Pa.C.S. § 9711(d)(7).

28. 42 Pa.C.S. § 9711(e)(1).

29. 42 Pa.C.S. § 9711(e)(8).

*monwealth v. Koehler,* 558 Pa. 334, 737 A.2d 225, 233 (1999), *cert. denied,* 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 41 (2000) (citing *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327, *rehearing denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983)). We perform this assessment regardless of whether the appellant explicitly raises a claim of insufficiency of the evidence. *Commonwealth v. Burgos,* 530 Pa. 473, 610 A.2d 11, 13 (1992); *Zettlemoyer,* 454 A.2d at 942 n. 3.

We have previously stated that:

> When reviewing a sufficiency of the evidence claim, an appellate court must view all of the evidence and all reasonable inferences arising therefrom in the light most favorable to the Commonwealth as the verdict winner in order to determine whether the evidence was sufficient to enable the fact finder to find that all of the elements of the offenses were established beyond a reasonable doubt.

*Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190, 195 (1997), *cert. denied,* 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Burgos,* 610 A.2d at 13. In turn, to sustain a conviction of first-degree murder, the Commonwealth must prove that: (1) the appellant acted with a specific intent to kill; (2) a human being was unlawfully killed; (3) the appellant did the killing; and (4) the killing was done with deliberation. *See Commonwealth v. Watkins,* 577 Pa. 194, 843 A.2d 1203 (2003), *cert. denied,* —— U.S. ——, 125 S.Ct. 450, 160 L.Ed.2d 324 (2004); *Koehler,* 737 A.2d at 233.

The above-recited evidence presented at Appellant's trial, viewed in the light most favorable to the Commonwealth, clearly establishes the sufficiency of the first-degree murder conviction.[30] The testimony of the witnesses, who identified

---

**30.** We find that the evidence was equally sufficient to support Appellant's convictions for conspiracy, aggravated assault, burglary, PIC, and multiple counts of robbery.

Appellant as the tall individual in the vicinity of the PNC Bank building immediately before and after the crime took place, as well as the testimony that, while inside the building, Appellant stayed at the front entrance and brandished a silver handgun, coupled with ballistic and forensic evidence, was abundantly sufficient for the jury to conclude that Appellant, possessing the requisite specific intent and with deliberation, unlawfully killed Officer Vaird.

Many of the arguments raised by Appellant, including all issues relating to the guilt phase of the proceedings, involve allegations of the ineffectiveness of counsel.[31] In *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), this Court announced, as a general rule, that claims of ineffective assistance of counsel should be raised for the first time in a collateral proceeding. *Id.* at 738. The holding of *Grant* was applied retroactively to all cases pending on direct appeal where a claim of ineffectiveness had been "properly raised and preserved." *Id.* Subsequently, in *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003), *cert. denied,* —— U.S. ——, 125 S.Ct. 30, 160 L.Ed.2d 31 (2004), the "Grant rule" was applied to capital cases.

On the same day as *Freeman*, this Court decided *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003), *cert. denied,* 540 U.S. 1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2004). Although *Bomar* was on direct (capital) appeal at the time we decided *Grant*, this Court ruled that *Grant* would not apply to *Bomar*, where claims of counsel ineffectiveness "were properly

31. In relation to the guilt phase, Appellant argues that his trial counsel was ineffective for failing to: (1) request that the trial court repeatedly instruct the jurors concerning premature discussions of the issues and avoiding media coverage of the case; (2) ensure that no seated juror knew of his trial counsel's past legal troubles; and (3) object to the trial court's jury charge on character evidence. As it concerns the penalty phase, Appellant contends that his counsel was ineffective for failing to object: (1) to the trial court's intermittent use of plural and singular form of the word "circumstance" during the jury instructions; (2) to a comment made by the prosecutor during the penalty phase closing argument indicating that Appellant had shown no remorse for the murder; and (3) to an allegedly erroneous instruction given by the trial court, which allowed the jury to consider the testimony of Norma Winn and Loretta Johnson as "victim impact evidence."

raised and preserved in the trial court." 826 A.2d at 853. We reached this conclusion because, in *Bomar,* appellant raised ineffectiveness claims in post-sentence motions, the trial court conducted a series of evidentiary hearings on the claims raised, and, ultimately, addressed them in its opinion. *Id.* at 839, 853–54. Thus, the concerns we articulated in *Grant*—the ability of the defendant to develop his ineffectiveness claims and the ability of the reviewing court to consider them—were not implicated in *Bomar. Id.* By way of these decisions, the "Grant rule" became a fundamental principle of capital appellate jurisprudence in the Commonwealth.

■ The present case is similar to *Bomar,* in that it was pending on direct appeal at the time *Grant* was decided. However, unlike *Bomar,* the trial court did not conduct an evidentiary hearing to explore the ineffectiveness claims raised by Appellant. For those cases that were pending on direct capital appeal at the time *Grant* was filed, to garner review on direct capital appeal of claims of ineffective assistance of counsel, there must be both an evidentiary hearing on the issues at the trial court and an opinion by that tribunal addressing them. Because in the matter *sub judice* there was no evidentiary hearing, we deem these claims not to be "properly raised and preserved" to fall within the narrow exception to the "Grant rule" articulated in *Bomar.* Therefore, we decline to address them at this juncture. Appellant is free to raise these arguments, however, during the collateral review of his conviction. *See Commonwealth v. Ramos,* 573 Pa. 605, 827 A.2d 1195, 1198–99 (2003) (dismissing ineffectiveness claims without prejudice to appellant to raise those claims in a petition filed pursuant to the Post–Conviction Relief Act, 42 Pa.C.S. § 9541 *et seq.*), *cert. denied,* 541 U.S. 940, 124 S.Ct. 1663, 158 L.Ed.2d 363 (2004).

The remaining arguments Appellant presents for our review were not raised before the trial court and would ordinarily be addressed by this Court within the purview of the "relaxed waived" doctrine. In *Freeman,* we recently abrogated this concept, setting forth "as a general rule on capital direct appeals, [that] claims that were not properly raised and pre-

served in the trial court are waived and unreviewable." 827 A.2d at 402. We further held that "[t]his new general rule would apply prospectively, beginning with those capital direct appeals in which the appellant's brief has not yet been filed in this Court, and is not due for thirty days or more after today's decision." *Id.* at 403. In accordance with our pronouncement in *Freeman,* because Appellant filed his brief with this Court before the decision in *Freeman* was announced, we address the remaining claims raised by Appellant. *See Watkins,* 843 A.2d at 1212 n. 5; *Bomar,* 826 A.2d at 849 n. 15.

■ Appellant complains that the trial court directed the jury to consider the "victim impact testimony" without first finding it credible and assigned no burden of proof to such testimony. Further, Appellant argues that his counsel was ineffective for failing to raise this issue with the trial court.

In the seminal case in Pennsylvania on the issue of "victim impact evidence," *Commonwealth v. Means,* 565 Pa. 309, 773 A.2d 143 (2001), "recognizing the complexity of victim testimony within the volatile atmosphere of the penalty phase in a death case," this Court offered the following prototype jury instruction on the issue:

> The prosecution has introduced what is known as victim impact evidence. Victim impact evidence is not evidence of a statutory aggravating circumstance and it cannot be a reason by itself to impose the death penalty. The introduction of victim impact evidence does not in any way relieve the Commonwealth of its burden to prove beyond a reasonable doubt at least one aggravating circumstance. **You may consider this victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt independent from the victim impact evidence, and if one or more jurors has found that one or more mitigating circumstances have been established by a preponderance of the evidence.** Victim impact evidence is simply another method of informing you about the nature and circumstances of the crime in question. You may

consider this evidence in determining an appropriate punishment. However, the law does not deem the life of one victim more valuable than another; rather, victim impact evidence shows that the victim, like the defendant, is a unique individual. Your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence. The sentence you impose must be in accordance with the law as I instruct you and not based on sympathy, prejudice, emotion or public opinion and not based solely on victim impact.

*Id.* at 158–59. We also related that "while th[is] **charge is not mandated** ... it furthers the intended goal of admitting relevant victim impact testimony, while eliminating the potential for impassioned emotional appeals to the jury." *Id.* at 158 (emphasis supplied).

In relevant part, the jury instruction used by the trial court in this case presently mirrors the statutory language of 42 Pa.C.S. § 9711(d)(7) and closely tracks the language we suggested in *Means*. The only discernable difference is the use of the word "shall" in the instruction given by the trial court as opposed to the word "may," which this Court used in the recommended instruction in *Means*. 773 A.2d at 158. This difference, however, is immaterial in light of our articulation in *Means* that this instruction was merely suggested and the fact that the statute also uses the word "shall." *See* 42 Pa.C.S. § 9711(d)(7). Thus, contrary to what Appellant argues, there was no error by the trial court on this issue.

■ Appellant also argues that the jury instructions violated the Sixth and the Fourteenth Amendments to the United States Constitution, because they did not require the jury to find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. In support of this argument, Appellant cites to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), where the United States Supreme Court held that the United States Constitution was violated where a factual finding that increases the maximum sentence is not found by a jury beyond a reasonable doubt. Appellant maintains that pursuant to

the Pennsylvania death penalty scheme, the maximum sentence for first-degree murder is a life sentence unless: (a) either an aggravating circumstance is found and no mitigating circumstances are determined to exist; or (b) one or more aggravating factors are determined to outweigh any mitigating circumstances found. Therefore, a finding of aggravating circumstances outweighing the mitigating circumstances increases the penalty for first-degree murder beyond the prescribed statutory maximum (life imprisonment). Hence, according to Appellant, *Apprendi* mandates that this be proven beyond a reasonable doubt.

In *Apprendi*, the defendant fired several bullets into the home of an African–American family that had previously moved into an all-white neighborhood. 530 U.S. at 469, 120 S.Ct. 2348. Thereafter, he pled guilty to various state firearm offenses and was given an enhanced sentence, pursuant to a state statute that allowed the sentencing judge to extend a penalty beyond the prescribed statutory maximum upon a finding, "by a preponderance of the evidence, that the defendant's 'purpose' for unlawfully possessing the weapon was 'to intimidate' his victim on the basis of a particular characteristic the victim possessed." *Id.* at 491, 120 S.Ct. 2348. On appeal, the United States Supreme Court rejected this sentencing scheme as unconstitutional, holding that, "[o]ther than the fact of a prior conviction, **any fact** that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348 (emphasis added).

Thereafter, *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), implemented the constitutional protections articulated in *Apprendi* to capital cases and, on this basis, invalidated a capital sentencing procedure from the State of Arizona. As described in the opinion,

[i]n Arizona, following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty.

*Id.* at 588, 122 S.Ct. 2428. Applying the *Apprendi* rationale to this scheme, the *Ring* Court reasoned that "[c]apital defendants, no less than non-capital defendants ... are entitled to a jury determination of **any fact** on which the legislature conditions an increase in their maximum punishment." *Id.* at 589, 122 S.Ct. 2428 (emphasis supplied). Ultimately, as articulated in a subsequent opinion by the United States Supreme Court, which analyzed the Pennsylvania death penalty statute, *Ring* "held that the Sixth Amendment requires that a jury, and not a judge, find the existence of any aggravating circumstances, and that they be found, not by a mere preponderance of the evidence, but beyond a reasonable doubt." *Sattazahn v. Pennsylvania,* 537 U.S. 101, 113, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003) (describing *Ring*).[32]

**32.** Recently, the United States Supreme Court decided *Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), wherein it addressed the retroactive application of *Apprendi /Ring* to a case involving the federal habeas review of a final state conviction. Ultimately, the Court held that *"Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review." *Summerlin,* 542 U.S. at ——–——, 124 S.Ct. at 2526–27. Unlike the procedural posture in *Summerlin,* however, in the present case, *Apprendi* and *Ring* were decided after Appellant's trial, but before the direct review of the conviction and sentence was finalized. As the U.S. Supreme Court reiterated in *Summerlin,* "[w]hen a decision of this Court results in a 'new rule,' that rule applies to all criminal cases still pending on direct review." *Summerlin,* 542 U.S. at ——, 124 S.Ct. at 2522 (citing *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)). Therefore, for purposes of the instant matter, Appellant should be entitled to receive the benefit of the retroactive application of the *Apprendi/Ring* line of cases. *See Griffith,* 479 U.S. at 322, 107 S.Ct. 708 ("failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication"). Nevertheless, to be entitled to the retroactive application of a new constitutional rule of law, a defendant must customarily have raised and preserved the issue in the court below. *See Commonwealth v. Cabeza,* 503 Pa. 228, 469 A.2d 146, 148 (1983) ("where an appellate decision overrules prior law and announces a new principle, unless the decision specifically declares the ruling to be prospective only, the new rule is to be applied retroactively to cases where the issue in question is properly preserved at all stages of adjudication up to and including any direct appeal"). Here, Appellant failed to raise and preserve his *Apprendi/Ring* claim before the trial court and, thus, he would not normally be entitled to the retroactive application of a new constitutional rule. However, because a challenge to a sentence premised upon *Apprendi* implicates the legality of that sentence, it cannot be waived on appeal. *Commonwealth v. Aponte,* 855

Presently, Appellant challenges the Pennsylvania scheme of weighing aggravating and mitigating circumstances, because the statute does not require the fact-finder to decide that the aggravators **outweigh** the mitigators beyond a reasonable doubt before it can sentence a defendant to death. However, as evident in *Ring*, *Apprendi* narrowly focused on a jury's fact-finding responsibility and did not involve any question concerning whether the "beyond a reasonable doubt" standard applies to a jury's **weighing** of the aggravating and mitigating circumstances **after** the defendant has been found eligible for the death penalty. Moreover, even if the jury engages in factfinding in connection with the weighing (or selection) process, *see generally Tuilaepa v. California*, 512 U.S. 967, 971–72, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994); *Commonwealth v. Boczkowski*, 577 Pa. 421, 465, 846 A.2d 75, 101 (2004), the death penalty—if ultimately imposed—does not constitute a sentence beyond the relevant statutory maximum for purposes of *Apprendi* and its progeny.[33] Accordingly, because the weighing of the evidence is a function distinct from fact-finding, *Apprendi* does not apply here.

The present case, moreover, does not implicate the "fact-finding" concerns articulated in *Apprendi* and *Ring*, because, unlike the invalidated Arizona sentencing scheme, the Pennsylvania death penalty statute, which Appellant is essentially challenging, already requires **a jury to find facts** supporting a decision to impose the maximum sentence beyond a reasonable doubt. Indeed, in Pennsylvania, in order to find a defendant eligible for the death penalty, **a jury must** unanimously **find** at least one **aggravating circumstance beyond a reasonable**

A.2d 800, 802 n. 1 (Pa.2004) (citing *Commonwealth v. Wynn*, 567 Pa. 183, 786 A.2d 202 (2001) (per curiam)). Therefore, absent a finding of waiver, we will address the substantive argument raised by Appellant.

**33.** Other jurisdictions to consider this issue have reached similar results. *See, e.g., Ex parte Hodges*, 856 So.2d 936, 944 (Ala.2003); *People v. Prieto*, 30 Cal.4th 226, 133 Cal.Rptr.2d 18, 66 P.3d 1123, 1147 (2003); *People v. Davis*, 205 Ill.2d 349, 275 Ill.Dec. 781, 793 N.E.2d 552, 565–66 (2002); *Ritchie v. State*, 809 N.E.2d 258, 266 (Ind.2004); *Oken v. State*, 378 Md. 179, 835 A.2d 1105, 1147 (2003); *State v. Gales*, 265 Neb. 598, 658 N.W.2d 604, 626–27 (2003); *State v. Holton*, 126 S.W.3d 845, 864–65 (Tenn.2004).

**doubt.** 42 Pa.C.S. § 9711(c)(1)(iii). Once it has found at least one aggravating circumstance, the jury must sentence the defendant to death if it finds no mitigating circumstances. If any juror finds at least one mitigating circumstance by a preponderance of the evidence, the jury must decide whether the aggravating circumstance outweighs the mitigating circumstance. 42 Pa.C.S. § 9711(c)(1)(iii).

As it relates to Appellant's claim regarding the weighing process during a penalty phase deliberation, this Court has already rejected an identical argument in *Commonwealth v. Bronshtein,* 547 Pa. 460, 691 A.2d 907 (1997), *cert. denied,* 522 U.S. 936, 118 S.Ct. 346, 139 L.Ed.2d 269 (1997). In *Bronshtein,* the defendant argued that the trial court erred in denying his request "that the jury be instructed that the death penalty could only be imposed if the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt." 691 A.2d at 922. In denying relief on this ground, this Court stated that "the death penalty statute does not specify a fixed burden of proof for the weighing of aggravating and mitigating circumstances" and, therefore, the defendant was not entitled to an instruction that was not an accurate reflection of the law. *Id.*

Similarly, in *Zettlemoyer,* this Court rejected a claim that the death penalty statute is unconstitutional because it "fails to instruct the jury that the aggravating circumstances must outweigh the mitigating circumstances 'beyond a reasonable doubt.'" 454 A.2d at 963. In like fashion, this Court has consistently rejected the argument that the Pennsylvania death penalty statute is invalid because it imposes no standards by which the jury can weigh aggravating versus mitigating circumstances. *See Means,* 773 A.2d at 153–154; *Hall,* 701 A.2d at 207–208; *Commonwealth v. Lambert,* 529 Pa. 320, 603 A.2d 568, 576 (1992); *Commonwealth v. Zook,* 532 Pa. 79, 615 A.2d 1, 17–18 (1992), *cert. denied,* 507 U.S. 974, 113 S.Ct. 1420, 122 L.Ed.2d 789 (1993).

### III. Statutory Review of the Death Sentence

Having concluded that Appellant is not entitled to relief on any of the claims that he raises, we must affirm Appellant's

sentence of death unless we determine that the sentence was the product of passion, prejudice, or any other arbitrary factor or unless we determine that the evidence fails to support the finding of at least one aggravating circumstance. *See* 42 Pa.C.S. § 9711(h)(3).

Upon review of the record, we conclude that Appellant's death sentence was not the product of passion, prejudice, or any other arbitrary factor. Furthermore, we conclude that the evidence was sufficient to support the finding of three aggravating circumstances, namely: (1) the victim was a peace officer or law enforcement official killed in the performance of her duties; [34] (2) the killing was committed during the perpetration of a felony; [35] and (3) Appellant knowingly created a grave risk of death to another person during the killing.[36]

Accordingly, we affirm the verdict and the sentence.[37]

Former Chief Justice ZAPPALA and Justice NIGRO did not participate in the consideration or decision of this case.

Justice CASTILLE files a concurring opinion.

Justice SAYLOR files a concurring opinion.

Justice CASTILLE, concurring.

I join the Majority Opinion with the exception of its merits discussion of appellant's novel and waived penalty phase jury instruction claim, which is premised upon *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), cases which in tandem established a new constitutional rule of procedure affecting capital prosecutions, *see Schriro v. Summerlin,* 542 U.S. ——, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), but which did not exist when appellant

34. 42 Pa.C.S. § 9711(d)(1).

35. 42 Pa.C.S. § 9711(d)(6).

36. 42 Pa.C.S. § 9711(d)(7).

37. Pursuant to 42 Pa.C.S. § 9711(i), the Prothonotary of this Court is hereby directed to transmit the complete record of this case to the Governor of the Commonwealth of Pennsylvania.

was tried and sentenced in 1996.[1]  As to this issue, there is no question that the penalty phase of appellant's trial was conducted in full conformity with the then-governing law of the land.  Appellant's death sentence, therefore, unquestionably was legal when the jury returned it.

The Majority recognizes that appellant did not forward an innovative *Ring*-type of claim at his trial, and thus, under settled retroactivity precedent, his waiver of the claim should mean that he is not entitled to the retroactive benefit of the new *Ring* rule on this direct appeal.  *Commonwealth v. Tilley*, 566 Pa. 312, 780 A.2d 649, 652 (2001); *Commonwealth v. Cabeza*, 503 Pa. 228, 469 A.2d 146, 148 (1983); *see also Shea v. Louisiana*, 470 U.S. 51, 58 n. 4, 105 S.Ct. 1065, 1069 n. 4, 84 L.Ed.2d 38 (1985) (where new constitutional decision applies retroactively on direct appeal, it generally must be applied to cases pending on direct review at time of issuance, but "subject, of course, to established principles of waiver, harmless error, and the like").[2]  In the very next breath, however, the Majority affords appellant the retroactive benefit of the new procedural rule, despite his incontrovertible waiver.  The Majority reasons that *Apprendi*-based claims "implicate the legality" of existing sentences and, for that reason, must operate

1.  As the Majority notes, the *Apprendi* rule was extended to defendants in capital cases in *Ring. Ring* held that the Sixth Amendment entitles capital defendants to demand that a jury, rather than a judge, find the existence of facts (such as aggravating circumstances) which permit an increase in punishment, and that those facts be found beyond a reasonable doubt.  536 U.S. at 589, 603–09, 122 S.Ct. 2428.  Nevertheless, appellant's Brief cites only to *Apprendi* and not to *Ring*. The Court in *Summerlin* held that the *Ring* rule was a new constitutional rule of procedure, not substance, and was not a watershed rule of criminal procedure.  As such, the rule was not subject to retroactive application on habeas corpus review.  542 U.S. at ——–——, 124 S.Ct. at 2523–26.

2.  The Majority apparently seeks to dilute the effect of the *Cabeza/Tilley* principle by characterizing it as merely "customary."  The cases do not speak of, much less do they establish, mere judicial "customs."  The rule reflected in *Cabeza/Tilley* is a salutary principle of retroactivity law.  In our system of jurisprudence, trials are the main event, not mere costly and time-consuming previews or dry-runs.  A party, such as appellant here, who would seek to upset a judgment premised upon a new rule of procedure may properly be asked to show that he sought, but was denied, that relief at the point where such relief may effectively have been granted.

retroactively, even in instances where the U.S. Supreme Court would say they do not.

Of course, if the U.S. Supreme Court shared the Majority's view that its new procedural rule retroactively rendered all previously-issued capital sentences subject to challenges of sentencing "illegality," it would have reached the opposite result in *Summerlin* and would have dictated that all state capital sentencing proceedings were subject to retroactive reevaluation under *Ring*—unless we are to believe the High Court thought it was constitutionally proper for States to carry out "illegal" executions. Since the Court did not afford its new procedural rule such global retroactive effect, there is no rational way in which a pre-*Ring* sentence can be said to have been rendered "illegal" by *Ring*.

The primary flaw in the Majority's analysis rests in its erroneous assumption that appellant has raised a "constitutional" (and hence "illegal") sentencing claim, when the claim may properly be deemed a "constitutional" one only if appellant is entitled to the retroactive benefit of the new *Ring* procedural rule. In other words, the Majority's tautological conclusion that "constitutionality" and "sentencing legality" are implicated by this waived claim begs the predicate and controlling question of retroactivity. It is no answer to the retroactivity question to postulate: "but if the rule **was** retroactively operable here, and if the derivative claim here **did** have merit"—two essential predicates that are missing—"appellant **would** be posing a constitutional claim which implicated sentencing 'legality' and would therefore not be waivable."

I also respectfully disagree with the Majority's implicit assumption that all "constitutional" claims affecting sentencing necessarily implicate the "legality" of a sentence. In support of this far-reaching assumption of non-waiver, the Majority cites to a footnote in *Commonwealth v. Aponte*, 579 Pa. 246, 250 n. 1, 855 A.2d 800, 802 n. 1 (2004). The footnote simply noted **competing** authority in this Court on the question of whether *Apprendi*-based constitutional challenges to sentences implicate sentencing legality, and therefore are non-waivable, ultimately electing to reach the underlying merits

issue without purporting to resolve that procedural conflict. Mr. Justice Saylor had earlier noted his concerns with this Court's uncertain precedent concerning the illegal sentence doctrine and waiver in his dissent to the *per curiam* order in *Commonwealth v. Wynn,* 567 Pa. 183, 786 A.2d 202 (2001) (*Wynn* was discussed by the majority in *Aponte*); and, in a separate concurring opinion in *Aponte,* Justice Saylor accurately noted that *Aponte* did not "undertake to resolve" his concerns. 855 A.2d at 816 (Saylor, J., concurring).

I also wrote separately in *Aponte,* addressing the uncertainty and complexity in Pennsylvania law concerning the illegal sentence doctrine. *Id.* at 812–16 (Castille, J., concurring). I noted that the doctrine should not be deemed monolithic and should account for all relevant and countervailing considerations:

[A] claim that a sentence is "illegal" may be offered for a variety of reasons: to negate an abject waiver on direct appeal, as here; to secure substantive appellate review of a preserved claim in light of statutory restrictions, as in [*Commonwealth v. Bradley,* 575 Pa. 141, 834 A.2d 1127 (2003)]; as a basis for creating a form of extraordinary jurisdiction *nunc pro tunc, see Fajohn v. Commonwealth,* 547 Pa. 649, 692 A.2d 1067 (1997); and, I would expect, both to defeat limitations upon the retroactive application of new procedural rules and to secure belated collateral review of a sentence in the face of the statutory restrictions imposed by the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. 9541 *et seq.* Should this Courts construction of the term "illegal sentence" be so broad as to permit a party such as appellant to seek to innovate a new constitutional rule of procedure, where normative principles of issue preservation and retroactivity ordinarily would prevent such an innovation? Should that construction apply only to those seeking the benefit of an existing law or interpretation which calls into question the lawfulness of their sentences (as in the case of the appellant in *Wynn* who sought application of the *Butler* [*Commonwealth v. Butler,* 563 Pa. 324, 760 A.2d 384 (2000),*]) decision, as opposed to one seeking to make that

very law? Should the definition of what is an "illegal" sentence for purposes of avoiding a judicial issue preservation doctrine factor in the reality that the Court would essentially be permitting the defendant to mount a preemptive collateral attack, and thereby to avoid satisfying statutory limitations upon collateral attack as well as salutary limitations upon the retroactive effect of new constitutional rulings? Merely labeling a sentence as "illegal" hardly justifies defeating all other laws which exist to ensure a rational and fair system of review.

\* \* \*

Logically, the question of when a sentencing claim should be deemed to be of such fundamental importance as to defeat existing procedural defaults should depend upon a balance of the specific nature of the claim forwarded and the specific statute, rule or judicial default doctrine which would be negated by judicial consideration of the claim. I would flatly reject the blanket notion that if a sentencing claim is deemed to implicate "legality," it necessarily suspends all countervailing considerations. I would reserve that sort of status to those few sentencing claims which fall within the traditional realm of what may be called the "illegal": *i.e.,* those which challenge sentences exceeding the very jurisdiction or power of the sentencing court.

855 A.2d at 815.

In coming to terms with the far-reaching implications of the Majority's summary relaxed waiver holding today, it is important to recognize that the sole reason the *Aponte* court assumed that Aponte's *Apprendi* claim implicated the legality of his sentence was not specific to *Apprendi,* but rather, involved the broader assumption that all constitutional sentencing claims are non-waivable. The Majority's non-nuanced application of the assumed holding in *Aponte* has created the following relaxed waiver rule: "constitutional" challenges to sentences automatically implicate sentencing legality and therefore cannot be waived, even if the challenge is premised upon a new rule of non-retroactive effect. Since the only

608

rulings of the U.S. Supreme Court which bind this Court are those involving constitutional issues, apparently every new such decision in the sentencing arena will now be given global retroactive effect by this Court, even in the face of specific rulings from the High Court that no such effect is appropriate or required. Every concluded sentencing proceeding in Pennsylvania is now vulnerable to reinterpretation based upon every new and non-retroactive constitutional rule issuing from the High Court.

It bears noting that the Majority's relaxed waiver holding respecting constitutional sentencing claims in this case is squarely inconsistent with other, very-recent precedent from this Court. Thus, in *Commonwealth v. Cox*, 581 Pa. 107, 863 A.2d 536 (2004), this Court held that a claim sounding under *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), which was unpreserved at trial or on direct appeal, "is deemed waived" for purposes of the PCRA. 863 A.2d at 553–54. *Mills* established a new procedural rule governing the sentencing phase of capital cases (specifically, the non-unanimity requirement in the jury's weighing of mitigating circumstances). If today's Majority is correct that constitutional claims affecting sentencing "implicate the legality of th[e] sentence [and] . . . cannot be waived," op. at 600–01 n. 32, 866 A.2d at 360 n. 32, then *Cox's* holding that a *Mills* claim is waivable cannot stand close scrutiny. Although *Cox* was a PCRA appeal, and this is a direct appeal, that distinction cannot harmonize the cases. The same assumed "illegality" that defeats direct appeal waiver presumably would defeat PCRA waiver: facially "illegal" sentences do not become "legal" with the mere passage of time.

For my part, since the issue here is necessarily one of retroactivity, I would apply controlling retroactivity principles, rather than torture the definition of an "illegal sentence" so as to allow non-retroactive, new procedural rules to operate retroactively to eviscerate judgments which were unquestionably valid when rendered. Criminal trials should be evaluated according to the law as it existed at the time they were tried, unless the defendant anticipated and requested a new proce-

dural rule which was embraced before his conviction became final, or the new rule is of such watershed dimension that it has been deemed retroactively applicable to prior cases irrespective of doctrines of waiver, previous litigation etc. The difficulties this Court has had in coming to grips with the meaning of its "illegal sentence" doctrine should not change the fact that the U.S. Supreme Court, which devised the new rule at issue, has not deemed it of such watershed importance as to implicate the very "legality" of all existing death sentences. The practical meaning of the Court's non-retroactivity decision in *Summerlin* is that death verdicts which were returned before the new rule in *Ring* were not—not even arguably—rendered "illegal." I would defer to the High Court's judgment concerning the nature and proper scope of its new rule.

It is becoming increasingly apparent in cases like this one that the Siren's song of relaxed waiver still finds tempted and willing ears on this Court. Our *ad hoc,* issue by issue, return to the doctrine—in a footnote no less in this case—will create as much havoc as did the former rule. It is particularly ill-advised to reestablish the doctrine in a case such as this, where it allows for a concluded and proper trial to be evaluated by a new rule which did not exist and did not govern at the time of the trial. Although the ultimate result in this case causes no immediate harm, since Pennsylvania's capital sentencing scheme obviously comports with *Ring,* the very approach itself is flawed and may well work arbitrary havoc when the next new rule is at issue.

I recognize that the discretionary relaxed waiver doctrine is available in this direct capital appeal, since the briefs were filed before this Court issued its decision in *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (2003), which prospectively abrogated the relaxed waiver rule previously available on direct capital appeals. Notably, however, the Majority does not reach the waived claim on the basis of the former capital case relaxed waiver rule; instead, it inexplicably devises a new relaxed waiver rule specific to constitutional claims implicating sentencing "legality." I do not think that the former relaxed

waiver doctrine can properly be invoked where, as here, it would operate to permit a new and non-retroactive decision to operate retroactively in a case where no contemporaneous objection was raised at trial. This Court has emphasized that the relaxed waiver doctrine should only be applied in appropriate circumstances. *See, e.g., Commonwealth v. Watkins,* 577 Pa. 194, 843 A.2d 1203, 1214 (2003) (collecting cases); *Freeman,* 827 A.2d at 400–01, 406, 407 (same). *Accord Commonwealth v. Malloy,* 856 A.2d 767, 778–79 (Pa.2004). In addition, *Freeman* discussed the absurdity inherent in employing relaxed waiver when doing so would avoid bedrock questions of the retroactive application of new constitutional rules in cases where the defendant did not anticipate the rule later adopted. 827 A.2d at 395–96.

It is one thing to overlook a waiver where the foregone claim involves settled law, but quite another to employ the doctrine to allow an entirely new rule of law to operate to impeach the fairness of a trial that was properly conducted under the law then in existence. As I have noted above, unless a new procedural rule is the sort of watershed rule of criminal procedure which the U.S. Supreme Court has held is entitled to "full" retroactive effect, the presumption should remain that retroactive application is available only where the defendant preserved the specific argument and his case is still pending on direct appeal. In this regard, it is notable that, for purposes of federal habeas corpus review of state convictions, the U.S. Supreme Court has held that the fact that this Court employed relaxed waiver to reach a claim belatedly raised under *Mills v. Maryland, supra,* which was not preserved when the case was tried pre-*Mills,* did not absolve the Third Circuit from having to determine whether that federal rule should properly be deemed retroactively applicable. *See Horn v. Banks,* 536 U.S. 266, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) *(per curiam ).* In a later appeal in the *Banks* case, the High Court reversed the Third Circuit a second time, holding that *Mills* was a new procedural rule; that it was not subject to retroactive application; and thus it could not be employed to overturn a Pennsylvania conviction which was secured

before *Mills* was decided. *See Beard v. Banks,* 542 U.S. 406, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004). In construing relaxed waiver, I think this Court should employ a similar approach: a new procedural rule of federal constitutional law should be deemed retroactively applicable only in instances where the U.S. Supreme Court would require it to so operate. Since this case does not pose such an instance, this Court should not reach the merits of appellant's belated *Ring* claim.

Justice SAYLOR, concurring.

I join the majority opinion. With respect to the matters deferred to post-conviction review pursuant to *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), however, I would note that one of these claims—pertaining to evidence in the nature of victim impact testimony of two bank employees who were unrelated to the murder victim—is framed in the alternative as a preserved claim of trial court error, inasmuch as trial counsel timely objected to the introduction of such testimony and unsuccessfully requested a limiting instruction. *See* Brief for Appellant at 47 n. 24; N.T. 11/1/96 at 20, 40–41, 118. As the majority neither addresses the claim as such nor expressly finds it waived, *see* Majority Opinion, *op.* at 595 n. 31, 866 A.2d at 356 n. 31, it seems to me that the post-conviction court should remain free to make its own independent determination as to the proper preservation of this issue based upon the trial record and the appellate briefs that were submitted to this Court, and, if the claim is deemed preserved, its merits as a direct claim of trial court error.